### Commonwealth *vs.* Herby Caillot
### (and a companion case[1]).

Plymouth. May 10, 2007. - August 16, 2007.

Present: Marshall, C.J., Ireland, Spina, & Cordy, JJ.

*Practice, Criminal,* New trial, Argument by prosecutor. *Evidence,* Motive, Hearsay, Argument by prosecutor.

In the circumstances of a murder case, the trial court judge abused his discretion in granting a new trial to the defendants based on the combined effects of two alleged errors, namely, improper closing argument by the prosecutor concerning motive and newly discovered ballistics evidence, where the prosecutor's argument concerning motive was supported by, and did not misstate, evidence presented at trial [719-722], and where the defendants failed to demonstrate that the ballistics evidence, which included inadmissible hearsay, speculation, and distinguishable circumstances, cast real doubt on the justice of the convictions [722-726].

Indictments found and returned in the Superior Court Department on April 28, 1997.

The cases were tried before *Mitchell J. Sikora, Jr.,* J., and motions for postconviction relief were heard by him.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

*Donald A. Harwood* for Manuel R. Santos.

*John J. Barter* for Herby Caillot.

Ireland, J. On October 5, 1998, a jury convicted the defendants of murder in the first degree, as joint venturers, by reason of deliberate premeditation. The defendants appealed and filed various motions for postconviction relief in the trial court that were denied by the trial judge. The appeal was entered here in September, 2000. Represented by new counsel, the defendants filed, in July, 2001, motions for postconviction relief in this court. Appellate proceedings were stayed and the motions, by

---

[1]Commonwealth *vs.* Manuel R. Santos.

order of the full court, were remanded for disposition to the Superior Court. After various proceedings, including evidentiary hearings, the trial judge granted the defendants' motions and granted a new trial based on the combined effect of two errors, namely, improper closing argument by the prosecutor concerning motive and newly discovered ballistics evidence. The Commonwealth's appeal from the allowance of these motions is now before us.[2] We disagree with the judge's conclusion and vacate the order granting the defendants a new trial.

1. *Background.* We summarize the facts the jury could have found and the proceedings in the trial court. In the early evening of November 19, 1996, Desmond Campbell (Desmond)[3] and his girl friend were outside his home on 46 Winthrop Street, Brockton. The home is a three-family house located on the corner of Winthrop Street and Warren Avenue. Desmond, along with his mother, sister, and younger brother Daryl, lived in the second-floor apartment of the house. Desmond's aunt, Phyllis Murphy, and her boy friend, lived in the first-floor apartment. Teriell Murphy and Delicia Turner are Phyllis's children. The father of Turner's child was Carlo Clermy, the victim.

While outside, Desmond saw a green automobile, which appeared to be similar to a Dodge Stratus,[4] twice pass by. He met the eye of a black male who was peeking at him from the back seat of the automobile. Minutes later, Desmond observed a black male, who was approximately six feet tall and who was wearing a black coat, a dark "hoodie" (hooded sweatshirt), blue jeans, and black boots, climb down a wall at the house diagonally across the street, 451 Warren Avenue. The man went over to a white van parked in the front of the house. Two other men ran behind the van.

---

[2] We do not consider the defendants' claims of error. See *Commonwealth* v. *Martin*, 427 Mass. 816, 817-818 n.2 (1998). If the defendants choose to appeal from their convictions, we, in due course, will consider those appeals, along with any alleged error in denying their motions for postconviction relief.

[3] We use first names where there are multiple witnesses with the same surname.

[4] There was evidence that a Dodge Stratus is very similar in appearance to a Chrysler Cirrus and a Plymouth Breeze. There was also evidence that Desmond described the automobile differently on different occasions, one time referring to the automobile as a "green Dodge Stratus or Chrysler Cirrus," and another time solely as a "green Dodge Stratus-like vehicle."

Desmond and his girl friend went inside and then to Daryl's bedroom. Daryl went to his bedroom window and the men started shooting in his direction. After the shooting stopped, Daryl looked out the window and saw two of the men, both dark skinned and wearing black clothing (one wearing a hoodie), get into a green automobile parked up the street. One man sat in the front passenger seat, and the other got into the back seat behind the driver. The automobile drove off.

Turner telephoned Teriell. Teriell and the victim drove to 46 Winthrop Street in Turner's automobile, a light blue Honda. When they arrived, the police already were there. They spoke with some of their relatives about what had occurred, and departed in the Honda. They drove around, angry, upset, and wanting to retaliate.

The victim was driving. He stopped at a stop sign at the intersection of Warren Avenue and Nilsson Street. While Teriell was in the process of lighting a "blunt" (marijuana cigar), a white tow truck hauling a station wagon came around the corner. A light green, four-door, Chrysler Cirrus then came around the corner, shining its headlights on the Honda. The Chrysler stopped, and the rear door behind the driver's side opened. Teriell ducked down in his seat and heard multiple gunshots. The windows of the Honda blew out, and glass shattered all around. The victim was shot. The Honda drifted forward and crashed into a utility pole.

Teriell grabbed a nine millimeter semiautomatic pistol from the victim's waist area and got out of the automobile. Teriell saw a shadowy figure wearing dark clothing getting into the back seat of the Chrysler behind the driver. The Chrysler drove away, traveling east on Nilsson Street. Teriell chased after the automobile, attempting to shoot at it, but the gun would not fire because the safety was on. Teriell "cocked the hammer" and a bullet fell out to the ground. Teriell repeatedly fired at the Chrysler, shooting until he had no ammunition left. The Chrysler had to navigate around the tow truck that somewhat obstructed its passage. Once the Chrysler passed the tow truck, Teriell stopped shooting. He left the gun near a shed behind a variety store and returned to the Honda. The victim died as a result of gunshot wounds to his neck and back. Police arrived at the scene at approximately 6:16 P.M.

Officer Thomas M. Spillane of the Brockton police department arrived at a nearby hospital at approximately 6:40 P.M. Outside the entrance to the emergency room, Officer Spillane observed a green, four-door Chrysler Cirrus parked in a spot designated for handicapped drivers. The rear driver's side window and the rear passenger's side window were gone, there was glass inside the automobile, and there was blood on the rear seat and carpet.

Hospital personnel directed Officer Spillane to one of the defendants, Manuel Santos. Santos was wearing a dark hoodie. Santos admitted that he was the owner of the green Chrysler Cirrus parked outside of the emergency room. He stated that he had been driving in it on Main Street when someone tried to carjack him. Santos explained that someone had started shooting at him, and he had brought his friend to the emergency room. Officer Spillane brought Santos outside to two other police officers. One of the officers gave Santos Miranda warnings, after which he was placed in custody in the back seat of a police cruiser. The radio inside the cruiser was turned off. Santos told the officers that he "didn't do anything," but knew who did. Santos added that he had been carjacked and asked a police officer whether she thought he had murdered someone. That officer was not aware that anyone had been killed. She told Santos that the detectives would talk to him.

A few minutes later, Detective Arthur McLaren of the Brockton police department arrived. He turned off his radio and joined Santos in the back seat of the cruiser. While they were being transported to the Brockton police department, Santos told Detective McLaren that he had been driving down Warren Avenue when someone tried to hijack his vehicle. Detective McLaren asked if Santos knew who had shot at his vehicle, and Santos replied that it was "the same nigger that had shot, who had killed Steven." Santos stated that Steven was Steven Auguste, the defendant Herby Caillot's first cousin who had been killed three months earlier. Santos also repeatedly blurted out, "Six feet under or life," and asked Detective McLaren if he knew whether "the other party had died."

Back at the hospital, Officer Spillane spoke with Caillot, a black male. Caillot had been shot in the hand. At first, Caillot stated that he could not recall what had happened. Later, Caillot

said he had been shot, but had no idea where it happened. Soon thereafter, State Trooper Steven Paul Godfrey arrived and advised Caillot of his Miranda rights. Caillot explained that he was lying in the back seat of the automobile with his head behind Santos, who was driving. Caillot heard shooting. Caillot put his hand up in the air to pull himself up and was shot. Caillot relayed essentially the same information to another trooper, but added that earlier that evening he and Santos had been at a friend's house on Warren Avenue.

No weapons were found. Ballistics evidence recovered included a total of forty-six discharged cartridge casings and one projectile or "live round." Of the forty-six discharged cartridge casings, there were twenty discharged nine millimeter cartridge casings recovered from the lawn of 451 Warren Avenue. The remaining discharged cartridge casings, twenty-six nine millimeter discharged cartridge casings, and one live round were recovered from the intersection of Warren Avenue and Nilsson Street. This evidence was presented in conjunction with the testimony of the Commonwealth's ballistics expert, State Trooper Michael Robert Arnold, who testified that, based on his microscopic comparisons of the discharged cartridge casings, the discharged cartridge casings had come from three different weapons. He explained that seven discharged cartridge casings and one live round, all recovered from the intersection of Warren Avenue and Nilsson Street, came from "gun no. 1," a nine millimeter weapon.[5] Twelve discharged cartridge casings recovered from the lawn of 451 Warren Avenue and sixteen discharged cartridge casings recovered from the intersection of Warren Avenue and Nilsson Street came from "gun no. 2." Eight discharged cartridge casings recovered from the lawn of 451 Warren Avenue and three discharged cartridge casings recovered from the intersection of Warren Avenue and Nilsson Street came from "gun no. 3," some type of semiautomatic weapon. Trooper Arnold also testified that the projectile evidence recovered (with one specific exception) was "consistent with nine millimeter caliber ammunition," but that, without a weapon that could be used for comparison purposes, he could not state that any of the

---

[5]The location and nature of this ballistic evidence was consistent with Teriell's account of the shooting he had done.

projectile evidence came from any of the discharged cartridge casings recovered. Trooper Arnold went on to state that the discharged cartridge casings from gun no. 1 and gun no. 2 could have been used to fire the projectiles recovered from the victim's body.

The defendants did not testify. Their trial counsel called witnesses and solicited testimony during the cross-examination of several witnesses for the Commonwealth, which formed the basis of their main defense: misidentification. The defense pointed out that no one identified the defendants as the shooters, no murder weapons were found, no confessions were made, and the projectiles recovered from the victim could not be linked to any of the discharged cartridge casings that had been recovered. The defense maintained that the defendants were victims of a carjacking, and asserted that the defendants did not know either Teriell or the victim.

The defense pointed to several inadequacies in the police investigation, including the loss of physical evidence (Santos's clothing) and the mishandling of some of the ballistics evidence (discharged cartridge casings), and asserted that the police failed to investigate other viable leads that would have revealed the true identity of the shooters. The defense suggested that certain physical evidence, the lack of gunpowder residue on Caillot's clothing and the likely trajectory of the projectile or projectiles that shattered the back rear windows of the Chrysler Cirrus, showed that the defendants could not have been the shooters. Last, through cross-examination of Trooper Arnold, the defendants elicited evidence that the discharged cartridge casings recovered at 451 Warren Avenue and at the intersection of Warren Avenue and Nilsson Street matched discharged cartridge casings recovered at other locations before and after November 19, 1996, the date the victim was shot and killed. More particularly, discharged cartridge casings matching those from gun no. 3 were found at the scene of two drive-by shootings, one that took place on September 30, 1996, and another that took place on October 2, 1996; discharged cartridge casings matching those from gun no. 1 were found at the scene of a shooting that took place on November 25, 1996; and discharged cartridge casings matching gun no. 2 were found at the scene of

a nonfatal shooting that occurred on March 4, 1998. Referencing some of this evidence, the defense argued that the guns used were never connected to the defendants.

As mentioned, the defendants were convicted of murder in the first degree. Represented by their trial counsel, the defendants filed notices of appeal and various motions for postconviction relief based, in part, on prosecutorial misconduct. Specifically, the defendants asserted that the prosecutor improperly argued motive, that the shooting was revenge for the shooting death of Steven Auguste (Caillot's cousin), because the argument was not supported by, and misstated, the evidence. Caillot's counsel more fully explained that the argument misstated the evidence because the prosecutor knew that, when Santos told Officer McLaren that the shooter was "the same nigger that had shot, who had killed Steven," Santos was not referring to the victim or to Teriell because Santos had made other statements to a State Trooper "wherein he identified the person who killed Stevie Auguste as being one Buddha Coward." In written decisions, the trial judge denied the motions. Only Santos appealed from the denial of his motion for postconviction relief.

As has been stated, the defendants' appeals were entered here on September 21, 2000. Thereafter, in July, 2001, represented by new counsel (appellate counsel), the defendants separately filed motions for postconviction relief, which by order of the full court, were remanded to the Superior Court for disposition. In their motions, the defendants acknowledged that their appeals had been entered here and were "therefore subject to" the provisions of G. L. c. 278, § 33E. In addition to asserting numerous claims of ineffective assistance of trial counsel, the defendants again argued that the prosecutor's closing argument was improper because the prosecutor had been "overzealous" in attributing a motive for the victim's death to the defendants. Caillot's appellate counsel stated: "To the extent that this [c]ourt has already considered the issue of prosecutorial misconduct, it is requested that this motion be considered as an amendment to the previously filed motion or a motion for reconsideration thereof." Santos's appellate counsel also asked for reconsideration of the judge's denial of his first motion for postconviction relief.

In November, 2002, the defendants filed a joint motion to

amend their previously filed motions for postconviction relief. The motion, insofar as relevant here, was based on alleged newly discovered evidence consisting of the recovery of gun no. 2 and gun no. 3, and information related to the use of those guns in other shootings by individuals other than the defendants. In a written decision, the judge concluded that, pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a new trial was warranted based on the combined grounds of improper closing argument by the prosecutor and newly discovered evidence. We discuss each ground separately. Generally, "we consider whether a motion judge committed a significant error of law or other abuse of discretion in allowing a defendant's motion for a new trial." *Commonwealth* v. *Martin*, 427 Mass. 816, 817 (1998), citing *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

2. *Discussion.* a. *Prosecutor's closing argument.* Prior to his closing argument, and during a conference at which the judge addressed various evidentiary issues, motions for required findings of not guilty, and the charge, the prosecutor indicated that he intended to argue motive. The defendants did not object. In connection with Caillot's motion for a required finding of not guilty, the judge earlier had acknowledged that there had been a passing reference in the evidence to motive. During his closing argument, the prosecutor made repeated reference to revenge for the murder of Caillot's cousin, Steven Auguste, as motive for the shooting death of the victim. Trial counsel for the defendants objected at a sidebar conference following the closing arguments. In his instructions to the jury, the judge explained that closing arguments are not evidence. He also instructed as follows:

> "Now, in particular, with regard to closing arguments, I want to give you one specific point of guidance in this case. In the course of closing arguments, we had some reference to the issue or the element of motive, motive in the case, motive for the alleged crime. But, you should keep this in mind, that throughout the evidence in our case, we did not receive into evidence any information which indicated that the defendants . . . knew or knew of the victim, Carlo Clermy, or the witness, Teriell Murphy. There was no evidence in our case which indicated that one pair of

individuals knew or knew of the other pair. That is one point about the evidence that I wanted to remind you about."

In allowing the defendants a new trial based, in part, on the prosecutor's references to motive in his closing argument, the judge correctly applied the four-factor analysis set forth in *Commonwealth* v. *Arroyo*, 442 Mass. 135, 147 (2004), to assess what he perceived as improper[6] in the prosecutor's closing argument. In doing so, the judge questioned whether his instructions "operated forcefully enough," despite an earlier ruling he made (in connection with denying an earlier motion made by Caillot for postconviction relief based on the reference to motive in the prosecutor's closing argument) in which he had concluded that the jury are presumed to have followed his instructions. On whether the error, in the circumstances, possibly made a difference in the jury's conclusions, see *id.*, the judge noted that "the misleading argument [concerning motive] proceeded in contradiction of important information (the designation of Buddha Coward) never disclosed to the jury." The judge went on to explain:

> "The prosecutor's rationale was that Santos may have believed that [the victim] or [Teriell] was Coward so that a general argument of vengeful motive was still permissible. Defense counsel viewed the reference as a deliberate deception of the jury. The prosecutor's explanation for the reference is unpersuasive. If the prosecutor wished to argue that [the defendants] had mistaken either [the victim] or [Teriell] for Buddha Coward, it had a duty to inform the jury of the existence of Coward. It never did so."

We conclude that the judge abused his discretion in permitting the information concerning Coward to serve as a basis for granting the defendants a new trial.

Contrary to the defendants' contention, the prosecutor's argument concerning motive was supported by evidence at trial,

---

[6]With respect to each alleged impropriety, we consider the prosecutor's remarks in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury. *Commonwealth* v. *O'Connell*, 432 Mass. 657, 659 (2000), and cases cited.

namely, Santos's statements to Detective McLaren that the person who had shot at him and Caillot was "the same nigger that had shot, who had killed Steven [Auguste, Caillot's cousin]. "[7] Based on this testimony, the jury could have found that the defendants believed that one or more of the occupants of the other car who shot at them had been involved in the murder of Caillot's cousin. The prosecutor permissibly argued this inference that was reasonably derived from the evidence. See *Commonwealth* v. *O'Connell*, 432 Mass. 657, 659 (2000), quoting *Commonwealth* v. *Lawrence*, 404 Mass. 378, 391-392 (1989) ("We have never criticized a prosecutor for arguing forcefully for a conviction based on the evidence and on inferences that may be reasonably drawn from the evidence"). See also *Commonwealth* v. *Mendes*, 441 Mass. 459, 464 (2004), and cases cited (evidence of motive generally admissible; without challenged evidence murder could have appeared to jury as essentially inexplicable act of violence); *Commonwealth* v. *Ashley*, 427 Mass. 620, 624-625 (1998) (no requirement that evidence of motive be conclusive to be admissible).

The information concerning Coward would not have been admitted in any event, and therefore would not have been determinative, because it constituted classic "totem pole" or "layered" hearsay. See *McHoul, petitioner*, 445 Mass. 143, 144 (2005), cert. denied, 547 U.S. 1114 (2006); *Commonwealth* v. *Santiago*, 437 Mass. 620, 627 n.4 (2002). See also *Commonwealth* v. *McDonough*, 400 Mass. 639, 643 n.8 (1987) ("evidence based on a chain of statements is admissible only if each out-of-court assertion falls within an exception to the hearsay rule"). The information came from a State police report dated November 20, 1996. In the report, Trooper Joseph V. Mason, Jr., recounts that, several hours after the shooting, Santos relayed to him that Santos's girl friend told Santos that she had heard that Buddha Coward had bragged about shooting Steven Auguste. This alleged statement by Santos, which he

---

[7]There was no objection to the admission of this testimony at trial. In their July, 2001, motions for postconviction relief, the defendants argued that their trial counsel had been ineffective for failing to request a severance, that resulted in "constitutional prejudice," including violations of *Bruton* v. *United States*, 391 U.S. 123 (1968). In his motion allowing the defendants' motion for a new trial, the judge rejected these claims on multiple grounds.

previously had denied making in an affidavit in support of a motion to suppress statements, constitutes inadmissible "totem pole" hearsay, as it recounts only what his girl friend stated to him (and what she heard allegedly stated by another — Coward). See *Commonwealth* v. *Lynch*, 439 Mass. 532, 538, cert. denied, 540 U.S. 1059 (2003). The judge erroneously stated that the prosecutor justified omitting the information concerning Coward to the jury due solely to the fact that Santos may have believed that the victim or Teriell was Coward. While the prosecutor did advance that argument, he also asserted that he had no obligation to introduce the information concerning Coward because Santos had indicated that "he got the information [concerning Coward] from another source," namely, Santos's girl friend. The judge should have taken into account that the information was nothing more than "totem pole" hearsay lacking, at every layer, an exception to the hearsay rule to justify its admission, and thus could not be said to have any bearing on the defendants' state of mind. We add that in his first motion for postconviction relief based on prosecutorial misconduct, Caillot's trial counsel explained the obstacle of presenting evidence of lack of motive, namely, that "hearsay evidence could be introduced to show Caillot's state of mind, i.e., that he believed a certain person killed Auguste and that he believed that [the victim] was associated with that person." Strategic choices were made in deciding how to respond to the evidence concerning motive. Finally, we point out that in these circumstances, the judge's curative instruction was not warranted and actually served to undercut the prosecutor's case.

b. *Newly discovered evidence.* The judge granted a new trial based on the combined effect of the prosecutor's closing argument and newly discovered ballistics evidence. On the latter issue, the judge's findings are as follows. In response to discovery orders in May and October, 2002, the Commonwealth disclosed certain firearm identification reports. The reports show that, on June 25, 1998, months before the defendants' September, 1998, trial, Brockton police officers delivered to the State police a nine millimeter Taurus handgun. The State police firearms identification unit examined, test fired, and documented information about the weapon. Undated comments in the weapon's test

papers matched the Taurus to the discharged cartridge casings from gun no. 2 found at the intersection of Warren Avenue and Nilsson Street.

Further discovery showed that, on March 4, 1998, at which point the defendants had been arrested and confined, gun no. 2 discharged eight cartridge casings at the scene of a shooting in Brockton. In that incident, someone twice shot Jerry Dessalines in the head as he was driving on a public street (Dessalines survived).

Also in response to a posttrial discovery order, the Commonwealth, on October 22, 2002, produced documents showing the recovery of a Glock nine millimeter handgun by Brockton police officers on or about May 11, 1998, and its delivery to the State police firearms identification unit for examination and testing on that same day. Testing matched the Glock to the discharged shell casings from gun no. 3 at the intersection of Warren Avenue and Nilsson Street.

Police had recovered gun no. 3 from Donald Averett on or about April 10, 1998. A grand jury indicted Averett for the shooting murder, on March 31, 1998, of Alexander Colon. The police also suspected Averett of having been involved in a drive-by shooting in Brockton on April 1, 1998.

Before the defendants' September, 1998, trial, local and State police had custody of the suspected murder weapons and putative knowledge of the suspected continuing use of those weapons in shootings after the murder of the victim and after the arrest and confinement of the defendants. However, no individual or group of individuals within the local and State police departments had a comprehensive understanding of the meaning of this information during the period between "May-June and September of 1998." The ballistics record-keeping system was still rudimentary in the summer of 1998. It consisted mainly of handwritten notations on cumulative paper cards by various ballistics officers. In addition, before the defendants' September, 1998, trial, the prosecution did not have any specific knowledge of the custody and records generated by gun no. 2 and gun no. 3 as the suspected murder weapons. No intentional pretrial suppression of exculpatory evidence occurred.

The judge noted that the jury heard testimony about the

subsequent use of gun no. 2 in the Dessalines shooting, but did not hear any information about the subsequent use of gun no. 3 in the Averett shootings. The judge noted, "We do not know what pretrial investigative effort and results would have ensued from defense counsel's awareness of the subsequent uses" of gun no. 3. The judge concluded that the omission of the evidence about the later use of gun no. 3 in the Averett shooting, viewed in combination with the prosecutor's improper argument concerning motive, warranted a new trial. Based on the narrow grounds of his ruling, we focus only on the evidence concerning the use of gun no. 3 in the Averett shootings.[8]

The familiar principles governing a motion for a new trial based on newly discovered evidence are stated in *Commonwealth v. Grace*, 397 Mass. 303, 305-306 (1986):

> "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction . . . . The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. . . . Thus newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind. . . . Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. . . . The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations. . . . This process of judicial analysis

---

[8]The defendant's brief mentions other "evidence" supposedly connected to gun no. 3, but the judge made no findings concerning that other evidence, so we do not consider it in this appeal. We can take up the other claims of the defendants if and when they appeal from their convictions and from the denial of the postconviction relief they had sought. We add that the judge did not find that the prosecutor's failure to disclose gun no. 2 and gun no. 3 violated the principles set forth in *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). Because the Taurus and the Glock were found to be matches to gun no. 2 and gun no. 3, the actual weapons could not be said to constitute exculpatory evidence favorable to the defense. We need not decide the issue, however, because only the Commonwealth's appeal is before us.

requires a thorough knowledge of the trial proceedings
. . . and can, of course, be aided by a trial judge's observa-
tion of events at trial. . . .

"Not only must the allegedly new evidence demonstrate
the materiality, weight, and significance that we have
described, but it must also have been unknown to the
defendant or his counsel and not reasonably discoverable
by them at the time of trial (or at the time of the presenta-
tion of an earlier motion for a new trial). . . . The defendant
has the burden of proving that reasonable pretrial diligence
would not have uncovered the evidence." (Citations
omitted.)

In addition, a defendant must also show that any newly discovered
evidence is admissible. *Commonwealth* v. *Weichell,* 446 Mass.
785, 799 (2006), and cases cited.

Contrary to the defendants' contentions, the judge correctly
noted that, standing alone, the newly discovered evidence
concerning gun no. 3's use in the so-called Averett shootings
would fall short of satisfying the standards for granting a new
trial. However, the judge, in finding that the evidence (combined
with the prosecutor's reference to motive in his closing argu-
ment) warranted a new trial, erroneously attributed significance
to this "evidence." Notably, the defendants pointed to inadmis-
sible hearsay to try to establish a link between Averett and
Colon, relying on a State trooper's testimony during grand jury
proceedings against Averett indicating that another individual,
Lajuan Melton, stated that Averett had done the majority of the
shooting at the automobile in which Colon had been a pas-
senger, and stated that Averett had been found with a nine mil-
limeter gun (gun no. 3). See *id.* Even putting aside the hearsay
nature of the evidence, it should be noted that the defendants
ignored Melton's concession to the trooper that he (Melton) had
used the nine millimeter gun and that Averett had used a .380
caliber handgun during this shooting. In addition, the defend-
ants ignored, and the judge did not address in his findings,
evidence that, on the charge of murdering Colon, Averett was
acquitted. Concerning a drive-by shooting in Brockton that took
place on April 1, 1998, the defendants offered only speculation
that Averett had been the actual shooter in that case. Further, the

circumstances of that shooting are readily distinguishable from the shooting of the victim in this case. Notably, the drive-by shooting on April 1, 1998, followed a physical confrontation and actual fistfight (not directly involving Averett) that occurred over a person who had been killed in an automobile accident.

The judge's decision shows that he was influenced by the fact that, had the defendants been made aware of this subsequent use of gun no. 3, their pretrial investigative efforts may have been different and possibly helpful, considerations that are speculative. Through lengthy evidentiary hearings and extensive posttrial discovery, the defendants have fallen short, as we explained above, of demonstrating that the newly discovered evidence concerning the so-called Averett shootings "cast[] real doubt on the justice of the conviction[s]." *Commonwealth* v. *Grace, supra* at 305. They are accordingly not entitled to a new trial.

We add that the jury heard evidence at trial that the weapons involved in the victim's shooting had been involved in crimes before *and after* the victim's death. The defendants were able to argue that the weapons were still in circulation and that the "real" killers had not been apprehended. The defendants benefited from that strategy because they were able to avoid having to satisfy the heavy burden supporting the introduction of other culprit evidence. See *Commonwealth* v. *Lopez,* 433 Mass. 406, 416 (2001) ("Merely introducing another possible suspect, without substantial admissible evidence that this person, and not the defendant[s], may have committed the crimes, does not warrant a new trial"). Finally, none of the evidence concerning the use of gun no. 3 in the Averett shootings eliminated the defendants as the individuals who killed the victim.

3. *Conclusion.* The order allowing the defendants' motions for postconviction relief in the form of a new trial is vacated, and an order shall be entered denying both motions. The original convictions are to be reinstated.

*So ordered.*