## Commonwealth *vs.* Frank DiBenedetto
### (and three companion cases[1]).

Suffolk. October 5, 2010. - January 11, 2011.

Present: Marshall, C.J., Spina, Cordy, Botsford, & Gants, JJ.[2]

*Deoxyribonucleic Acid. Practice, Criminal,* New trial. *Evidence,* Exculpatory. *Judicial Estoppel.*

In an appeal by two criminal defendants from a Superior Court judge's order denying their motions for a new trial, which the defendants had brought on the basis of newly discovered deoxyribonucleic acid evidence, this court remanded the matter for further findings by the motion judge (who was also the trial judge) concerning the defendants' proffered evidence and their claims of its exculpatory value and, on the Commonwealth's request, for an evidentiary hearing on the scientific reliability of the defendants' proffered evidence. [663-671, 672]

There was no merit to a claim by two criminal defendants that the Commonwealth had adopted inconsistent positions at different stages of criminal proceedings in violation of the doctrine of judicial estoppel. [671-672]

Indictments found and returned in the Superior Court Department on May 21, 1986.

Following review by this court in 427 Mass. 414 (1998), motions for a new trial, filed on May 5 and August 8, 2005, were considered by *Robert A. Mulligan,* J.

*Wendy H. Sibbison* (*Dennis Shedd* with her) for Frank DiBenedetto.

*Elianna J. Nuzum* (*David J. Apfel* with her) for Louis R. Costa.

*Kris C. Foster,* Assistant District Attorney, for the Commonwealth.

Botsford, J. In February, 1994, a jury found the defendants,

---

[1]One against Frank DiBenedetto and two against Louis R. Costa.

[2]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

Frank DiBenedetto[3] and Louis R. Costa, guilty of murder in the first degree of Joseph John Bottari and Frank Angelo Chiuchiolo.[4] The events giving rise to the charges occurred on February 19, 1986. The defendants were first tried in 1988, and a jury found them both guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. This court reversed the convictions.[5] *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 38-39, 44 (1992) (*DiBenedetto I*).

The defendants were tried again in 1994. Richard Storella, who had been unavailable at the defendants' first trial, testified in person. The second trial also included, for the first time, expert testimony concerning the possible presence of blood on the sole of one of DiBenedetto's sneakers. That trial resulted in the guilty verdicts of February, 1994. This court affirmed those convictions, and denied the defendants relief under G. L. c. 278, § 33E. *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 416 (1998) (*DiBenedetto II*).[6]

In 2005, the defendants filed motions for a new trial on the basis of newly discovered evidence, and in particular, deoxyribonucleic acid (DNA) evidence. In 2009, the Superior Court judge who had presided over the defendants' second trial denied their motions. DiBenedetto filed a gatekeeper petition pursuant to G. L. c. 278, § 33E, seeking leave to appeal from the denial of his motion for a new trial, which a single justice of this court allowed. Costa then filed his own gatekeeper petition, seeking the

---

[3]Both defendants were convicted of murder in the first degree on a theory of deliberate premeditation; Frank DiBenedetto was also convicted of the crime on a theory of extreme atrocity or cruelty.

[4]While the victim's name is spelled two different ways throughout the record, we have consistently spelled the name "Chiuchiolo," as it appears in the indictments. *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 415 (1998) (*DiBenedetto II*).

[5]The reversals were based on the erroneous admission at trial of uncross-examined deposition testimony of Richard Storella, an unavailable witness for the Commonwealth. *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 38-44 (1992) (*DiBenedetto I*).

[6]The United States District Court for the District of Massachusetts denied DiBenedetto's petition for a writ of habeas corpus, *DiBenedetto* v. *Hall*, 176 F. Supp. 2d 45, 66 (D. Mass. 2000), and the United States Court of Appeals for the First Circuit affirmed that denial, *DiBenedetto* v. *Hall*, 272 F.3d 1, 13 (1st Cir. 2001), cert. denied sub nom. *DiBenedetto* v. *Spencer*, 535 U.S. 1024 (2002).

same relief as DiBenedetto. A different single justice allowed the petition, and ordered Costa's appeal consolidated with DiBenedetto's. For reasons we shall discuss, we remand the cases to the Superior Court for further findings and, on the Commonwealth's request, an evidentiary hearing on the defendants' proffered DNA evidence.

1. *Background.* Our focus is on the defendants' second trial. We begin with a brief summary of the facts as the jury could have found them, drawing heavily on the summary set forth in *DiBenedetto II.*

a. *Overview of the facts.* Around 9:30 P.M. on February 19, 1986, police found the bodies of the victims, Chiuchiolo and Bottari, in Slye Park in the North End section of Boston. The bodies were surrounded by blood and multiple spent bullet casings. Chiuchiolo had been shot seven times, five times in the head, and Bottari had been shot sixteen times, six times in the head.

Richard Storella, now available as a witness, see note 5, *supra,* "testified that he knew the defendants and that on the night of February 19, 1986, he had seen them, along with Paul Tanso, shoot the victims in Slye Park in the North End of Boston. According to Storella, the defendants told him that they had each shot both victims. Storella had given [five] different and inconsistent accounts of what he had seen that night, including one in which he claimed that he himself had been one of the murderers. He had been given immunity from prosecution."[7] *DiBenedetto II,* 427 Mass. at 415-416.

There was another witness who testified to having seen the murders. "At 9:30 P.M. that night, Joseph Schindler, a Boston lawyer, was sitting in his third-floor apartment overlooking the

---

[7] In 1988, both DiBenedetto and Costa moved to have their cases severed from each other, and from the third defendant, Paul Tanso. Their motions were allowed as to Tanso only. Tanso was therefore tried separately, and DiBenedetto and Costa were tried together. Tanso was initially convicted on two indictments charging murder in the first degree. See *Commonwealth* v. *Tanso,* 411 Mass. 640, 641, cert. denied, 505 U.S. 1221 (1992). We reversed his convictions because of the erroneous admission of Richard Storella's deposition testimony at his trial. See *id.* at 641-642. Tanso was also retried in 1994, again in a separate trial from DiBenedetto and Costa. The jury found Tanso not guilty.

park when he heard four or five 'cracks or pops' that he thought were fireworks. He had an unobstructed view of the park from his apartment. He looked out and saw orange-red flashes in the area of the hand of a man whom he later identified as Costa. He went to another, darkened room to obtain a better view. The sounds continued. The park was lit by the moon and artificial lights. He saw five men. Two of them fell to the ground, and the other three left the park. Leaving the park, the defendants came toward Schindler, first Costa, then Tanso, and finally DiBenedetto." *Id.* at 416. Before the man Schindler later identified as DiBenedetto left the park, however, Schindler saw him stop and turn around. The man moved back to one of the men who lay prone beside the benches,[8] and stood bent at the waist so that he was just a few inches from the head area of the prone individual. Schindler then saw four to six flashes accompanied by the same sound he had initially heard. "Schindler called the police. He described the defendants to the police, descriptions which were not entirely accurate, and later identified them in separate lineups and in three different court proceedings." *Id.* Schindler estimated that the entirety of his observations of the men in the park — beginning when he first heard shots and continuing until he finally saw each of them walk out of the park one at a time and down to Boston Harbor — took place within a three-to-five minute period.

b. *Sneaker evidence.* Schindler testified at the 1994 trial that on the night in question, February 19, 1986, the man he identified as DiBenedetto[9] wore white Nike brand sneakers that had become "grayish with age," identifiable by the trademark red "swoosh" design on them. There was evidence that when Di-Benedetto was arrested four days later, on February 23, he was wearing a pair of stained, white Nike sneakers that were eventually seized by the police and introduced as evidence at trial. When shown the sneakers at trial, Schindler testified that they "looked similar to the footwear Mr. DiBenedetto was wearing on February nineteenth."

---

[8]The victim near the benches was identified by a police officer at trial as Chiuchiolo.

[9]This man is sometimes referred to hereafter in this opinion as "the third shooter."

At the time DiBenedetto's sneakers were seized in 1986, they were sent to the Boston police crime laboratory (crime lab) for testing. A senior criminalist employed by the crime lab visually examined the sneakers for the presence of blood, but observed nothing remarkable and specifically observed no stains that could be tested for the presence of blood. No chemical testing of the sneakers was conducted at that time.

On December 31, 1993, on request by the prosecutor and days before the retrial of DiBenedetto and Costa was scheduled to begin, David L. Brody, the director of the crime lab, performed a preliminary test for the presence of blood on the sneakers. The test was conducted with the use of the chemical phenolphthalein and hydrogen peroxide, an oxidizing agent. Brody's test of the right sneaker yielded no positive results, but an outside edge of the sole of the left sneaker tested positive, meaning the result indicated the presence of blood. George Abbott, an expert retained by the defendant, however, was unable to replicate this result on the left sneaker, but identified a small area on the sole of the right sneaker that tested positive.

The type of phenolphthalein test performed by Brody and Abbott may return a false positive if applied to certain plant substances, referred to as "plant peroxidase." Moreover, the test does not distinguish between human blood and any other animal blood. It is only possible to make that type of distinction by performing one or more additional, confirmatory tests for the presence of human blood, but none was performed. Immediately before the second trial, the defendants' counsel moved to suppress any evidence relating to the phenolphthalein test results and in effect renewed the motion at trial; their argument, made most forcefully at trial, was that the evidence as presented did not allow a reasonable inference that any blood on DiBenedetto's sneakers was in fact the blood of "any relevant party" present at Slye Park on February 19, 1986. The motion to suppress was denied, the defendants' argument on the issue at trial overruled, and the jury heard evidence from Brody and from Abbott about the testing of the sneakers for blood and the respective experts' opinions concerning the results of the testing. In her closing, the prosecutor argued:

"Should [the sneakers] have been chemically tested in

[1988, the year of the first trial]? You bet your boots. Any reason they weren't? Not to my satisfaction. And that, ladies and gentlemen, is why the request was made for an objective examination, a chemical test. Not a subjective, what-do-you-see test, but something that is an objective test for the presence of blood. The defendants ask you to speculate how they got there. Could have been in the restaurant. Remember that witness? Could have been veal blood. Except, then what do you learn? First of all, he didn't even take the sneakers home. They go up over the fridge. 'No, no, that didn't happen.' 'Well, didn't you tell Detective Ross that?' 'Well, now I don't remember.' Remember that testimony? And you also know that if that had happened in any restaurant, those sneakers would be covered, covered. . . . Feces? When there's no fecal matter that is seen? Feces? How do you get feces on both feet? Does that make any sense? Again, what evidence is there that that even happened? You are being asked to speculate. Plant peroxidase. Eliminated. And you heard how that's eliminated. Sure. [The defense expert] wants you to believe, oh, no, there's microorganisms. What did he base that on? Was that credible? . . . And so, ladies and gentlemen, what do you find out? That blood is present. Defense wants you to speculate. Remember those questions by [Costa's defense counsel]? Feces? Pepperoni? Meat Sauce? Is there one shred of evidence that Frank DiBenedetto came into contact with any of those things? No. Are the sneakers meant to be the be-all and end-all? No. But, ladies and gentlemen, they are meant to offer you a small bit of corroboration. Because when do we know from all the testimony that Frank DiBenedetto was wearing the size eleven and a half worn Nikes? We know, ladies and gentlemen, that he was wearing them as he stood over the prone body of Frank Chiuchiolo, the prone and bleeding body of Frank Chiuchiolo and blasted into the body. That's when we know he was in the presence of blood, ladies and gentleman. That's not speculation. That is testimony of two witnesses each independently corroborated. That's how we know. That's the one piece of real evidence, not speculation, that we have, that the one time those sneakers were in the presence of blood is as he blasted into the body of Frank Chiuchiolo."

In 2004, Janet Hanniman, a forensic serologist retained by the defendants, reanalyzed DiBenedetto's sneakers. She was able to extract DNA evidence from the area of the left sneaker that Brody testified had yielded a presumptive positive result for the presence of blood; she also extracted DNA from stains on other specific portions of the right and left sneakers. She found that the DNA yielded "weak and incomplete genetic profiles that were mixtures from at least three people." Based on her examination, she excluded both Chiuchiolo and Bottari as contributors to that DNA. Hanniman opined that if the blood of either victim had been the cause of the positive preliminary tests completed in 1993-1994, DNA contained in that blood also would have been present on the sneakers; and that if that DNA were present, it would still be detectable in 2004. Hanniman could not confirm whether blood was the source of the DNA she identified, but she could not exclude it as a possibility.

c. *The motion judge's decision.* In denying the defendants' motions for a new trial, the judge in effect assumed the DNA evidence was "newly discovered." He rejected, however, the defendants' arguments that the new DNA test results undermined the value of the phenolphthalein evidence as presented by the Commonwealth, and that the confirmed absence of the victims' DNA on the sneakers constituted exculpatory evidence reasonably suggesting that DiBenedetto was not one of the shooters.[10] Ultimately, the judge concluded that the defendants had failed to establish the 2004 DNA test results "cast[] real doubt on the justice of the conviction[s]." *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986) (*Grace*).

2. *Discussion.* Motions for a new trial are addressed to the

---

[10]Thus, as to the first argument, the judge found that "the defendants could have gained only little from further marginalizing what was just 'marginally instructive testimony' to begin with, see [*DiBenedetto II*], 427 Mass. at 416. The forensic testimony regarding DiBenedetto's sneakers was highly equivocal and of doubtful importance in the jury's deliberations." Given the conflicting expert testimony the jury heard and the questionable value of the evidence about the phenolphthalein tests, the judge could not "conclude that new evidence which further questions the value of those tests to the Commonwealth's case would have been a real factor in the jury's deliberations." The judge did not address in any detail the defendants' second argument about the independent exculpatory value of the new evidence, stating that "the strength of the Commonwealth's case, exclusive of the forensic testimony regarding the sneakers, overwhelms the nominal exculpatory value of the 2004 DNA test results."

"sound discretion" of the trial judge. *Commonwealth* v. *De Christoforo*, 360 Mass. 531, 542 (1971). "[A]n appellate court will examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Wolinski*, 431 Mass. 228, 235 (2000), quoting *Grace*, 397 Mass. at 307. A judge may decide a motion for a new trial without holding a hearing "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). See *Commonwealth* v. *Mercado*, 452 Mass. 662, 672-673 (2008).

Because the defendants moved for a new trial on the ground of newly discovered evidence, we apply the principles governing such motions that are set out in *Grace*, 397 Mass. at 305-306. See *Commonwealth* v. *Caillot*, 449 Mass. 712, 724-725 (2007). Those principles are the following:

> "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. . . . The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. Thus newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind. . . . Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. . . . The strength of the case against a criminal defendant, therefore, may weaken the effect of evidence which is admittedly newly discovered. . . . The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations. . . . This process of judicial analysis requires a thorough knowledge of the trial proceedings . . . and can, of course, be aided by a trial judge's observation of events at trial . . . ." (Citations omitted.)

*Grace, supra.*[11]

---

[11]In opposing the motions, the Commonwealth did not argue that the DNA evidence was not newly discovered, and the motion judge concluded that it

The defendants argue that the results of the new DNA testing contained in the affidavit and accompanying reports of the forensic serologist, Janet Hanniman (collectively, new DNA evidence), meet the *Grace* standard. As they did before the motion judge, they begin with the proposition that the new DNA evidence is "newly discovered" as the term is explained in *Grace*, 397 Mass. at 306, and then claim that (1) the evidence completely undermines the theory and argument advanced by the Commonwealth at the previous trial that there was blood on the sneakers and, inferentially, that the blood came from the victim or victims; and (2) quite apart from eliminating the Commonwealth's theory and argument, the DNA test results are independently and affirmatively exculpatory in light of the repeated evidence at trial that there were large pools of blood surrounding the victims,[12] and that the third shooter — identified by the eyewitnesses as DiBenedetto — stood or even knelt right beside one or perhaps both of the victims as he was repeatedly shooting him (or them). Their argument on this last point is that in light of the evidence just described, any reasonable juror would assume or infer that the blood of one or both of the victims would be present on this shooter's shoes, the shooter was described by Schindler as wearing Nike sneakers, the DNA test results establish that neither victim's blood was on DiBenedetto's Nike sneakers, and therefore, the juror might well conclude, the shooter was not DiBenedetto.

a. *Impact of the new DNA evidence on the sneaker evidence presented by the Commonwealth.* The basis on which the Commonwealth successfully introduced the evidence concerning the positive phenolphthalein test results was that the testing created a presumption that blood was on DiBenedetto's Nike sneakers; the jury could infer it was more likely than not that the presumptive blood was human blood; and in the particular circumstances, they could further infer that it was the blood of one of the victims and therefore relevant to the identification of the shooter because Schindler described the shooter as wearing Nike

---

was not necessary to decide the issue. We also do not consider whether this evidence is "newly discovered." The Commonwealth has included an argument on the issue in its brief; the Commonwealth is free to raise it on remand.

[12]The jury also saw photographs of this blood on the ground.

sneakers.[13] Assuming for argument that the new DNA evidence and Hanniman's analysis of it is scientifically reliable and accurate, we agree with the defendants that such evidence would appear to remove that ground for admission of the earlier phenolphthalein test results. We also agree that without that evidence, the prosecutor's argument to the jury, tying the claimed blood on the sneaker directly to DiBenedetto, could not have been made.

If this were the only potential impact of the new DNA evidence, it might well be insufficient to reject the conclusion reached by the motion judge that the evidence itself was marginal,[14] and the new DNA evidence simply made it more marginal. That is, despite the forceful closing of the prosecutor urging the jury to infer that DiBenedetto was wearing these sneakers as he stood over and "blasted" shots into Chiuchiolo's body thereby transferring blood to the Nikes — evidence she described as "the one piece of real evidence, not speculation" — at their core, the phenolphthalein test results were highly ambiguous.[15] Given this reality, it might be difficult to conclude that the judge, who was

---

[13]Out of the hearing of the jury, the prosecutor argued:

"The evidence is quite clear from the testimony of Mr. Schindler that the defendant DiBenedetto got within six inches to one foot of the body, the prone body of Frank Chiuchiolo, and fired into the head some four to five times. Subsequent to that, the first officer on the scene testified as to the blood patterns that appeared on the ice. I suggest that the reasonable inference is that Mr. DiBenedetto was in a position to receive the blood on the sneaker at that point in time. And further, there is only speculation as to these other sources of blood. At this point in time the sneakers are seized within four days. There's nothing to suggest that the blood came from any other source."

The judge then denied the motion to strike the testimony.

[14]This court as well as the United States Court of Appeals for the First Circuit also commented on the marginal nature of the phenolphthalein test evidence. See *DiBenedetto II*, 427 Mass. at 416 ("The only other incriminating evidence . . . was marginally instructive testimony that a small trace of blood was found on one of DiBenedetto's sneakers"); *DiBenedetto* v. *Hall*, 272 F.3d at 12 ("it is difficult to imagine the sneaker evidence played much of a role in the jury's determination").

[15]Thus, the jury heard that, although David L. Brody, the Boston police crime laboratory (crime lab) director, found a spot that tested presumptively positive for blood on the left sneaker, George Abbott, the defense expert, was unable to replicate those results. Abbott then went on to obtain a positive result on the right sneaker where Brody had found nothing. Brody also agreed that the phenolphthalein test would react to dried blood, which can be transferred

of course the trial judge and to whom we owe deference on the matter, abused his discretion in concluding in effect that the evidence concerning the phenolphthalein test results probably was not "a real factor in the jury's deliberations," and not likely to create "a substantial risk that the jury would have reached a different conclusion" if it had not been admitted at trial. See *Grace*, 397 Mass. at 306.

The defendants contend, however, that elimination of the Commonwealth's phenolphthalein test result evidence is not the only impact of the new DNA evidence. In addition and more importantly, they claim, the evidence is independently exculpatory. We turn to this argument.

b. *Independent, exculpatory value of the new DNA evidence.* The defendants begin with the conclusion of the forensic serologist, Hanniman, that if there had been blood of the victims on the sneakers as of February 19, 1986, DNA from that blood would still be on the sneakers when they were tested in 2004. The fact that DiBenedetto's sneakers are now shown to have contained profiles of mixed DNA samples, all of which exclude the victims as the source, is, the defendants claim, critically exculpatory evidence. See *Commonwealth* v. *Williams*, 455 Mass. 706, 714 n.6 (2010), quoting *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 n.9 (1978) (defining exculpatory evidence). They point out that Schindler testified that DiBenedetto, the third shooter, whom he had identified as wearing the Nike sneakers at issue, stood over the prone body of Chiuchiolo "such that he was within a matter of inches" from the area of the victim's head; that Storella testified DiBenedetto was standing "over" the body of Bottari when he began shooting at him in a downward angle; that there was consistent testimony offered by a number

---

by a hand touching one item and then another, and admitted that he had no way of knowing whether someone authorized to be in the crime lab might have touched the sneakers without wearing rubber gloves. He further acknowledged that both he and the assistant district attorney had, for example, touched the sneakers just a few days prior to his testifying, both without wearing gloves. Moreover, although the test yielded a presumption of blood, Brody was unable to determine whether the substance was human or animal blood; no confirmatory tests were performed. Indeed, there was discrepant testimony among those who tested the sneakers as to whether the substance was even blood at all, with the defense expert opining that he could not eliminate the possibility that the phenolphthalein reacted to a plant peroxidase.

of witnesses that both victims were surrounded by pools of blood as they lay on the ground in the park; and that blood or blood spatter are likely to be transferred to the shoes of a person who steps in it or who shoots a person lying near the shooter's feet. In the context of all this evidence, the argument goes, the new DNA evidence could well signify to a reasonable juror that DiBenedetto, the owner and wearer of the sneakers, was not the third shooter, casting real doubt on Schindler's identification of DiBenedetto as well as Costa. Therefore, they conclude, the evidence "would probably have been a real factor in the jury's deliberations." *Grace*, 397 Mass. at 306.

The defendants' argument is not without merit. As this court noted in considering the defendants' direct appeal, the major question confronting the jury in these cases was whether the defendants were two of the shooters in Slye Park, and the Commonwealth's case depended on three sources of incriminating evidence: the identification by Storella, who knew the defendants and the victims; the identification by Schindler, who did not know any of the defendants or the victims; and the "marginally instructive" phenolphthalein test evidence relating to the sneakers. *DiBenedetto II*, 427 Mass. at 416. The reasons for finding Storella's testimony unreliable and incredible were legion.[16] See *id.* at 415-416. In light of those reasons, and assuming as we previously did that the significance of the phenolphthalein test evidence was minimal, it is fair to conclude that Schindler was the linchpin of the Commonwealth's case. There was evidence

[16]As previously indicated, in the years between the 1986 murders and the 1994 trial, Storella had given five different accounts of what he did and what he saw on the night of the murders, including one account in which he identified himself as one of the three shooters. At one point in this eight-year period, he entered into an agreement with the prosecutor's office that would immunize him from being charged with robbery of DiBenedetto, but did not deal with any charge of murder. Then, within a few months of the 1994 trial, Storella entered into a different immunity agreement with the prosecutor, one that gave him immunity from prosecution for any crimes connected with the shootings, including murder. By the start of trial in January of 1994, Storella's story was that he had set up the meeting in Slye Park between the victims and the defendants, but then hid behind a mailbox at the entrance of the park and observed the shootings from there until he ran away. Storella also admitted many times during his testimony at trial that he had lied repeatedly in the past in his accounts to police and others — sometimes in sworn testimony before courts — about the murders, his role in them, and his observations.

at trial that presented some basis to question the reliability of Schindler's identification testimony.[17] The new DNA evidence, on the other hand, might be understood by the jury as discrediting one of the central aspects of Schindler's identification of DiBenedetto — namely, the Nike sneakers with a swoosh that Schindler described on the third shooter when he stood and bent over Chiuchiolo in a location that placed his feet in, or in very close proximity to, pools of Chiuchiolo's blood.[18,19]

[17]There was evidence of the following. Schindler identified DiBenedetto, Costa, and Tanso in three lineup procedures conducted at a Boston police station on February 28, 1986; on February 25, three days before that procedure, Schindler had read an article in the Boston Globe indicating that three suspects had been arrested in connection with these murders, and accompanying the article was a photograph of DiBenedetto and Tanso; although Schindler testified that he had instructed his secretary and law partner to remove any photographs relevant to the case before giving him the newspaper, both testified at trial, and neither had a memory of such a conversation taking place; Schindler identified DiBenedetto and Costa while they were sitting with the public in the back of court rooms during two different court proceedings, but each of these identifications followed closely — a matter of days — after Schindler had participated in the lineup procedures that had featured the defendants; Schindler testified at trial that DiBenedetto had on white Nike sneakers with a red trademark swoosh, but he did not recall the Nike brand or the red "swoosh" until two years after the murders, and after he had seen the white Nike sneakers belonging to DiBenedetto in the prosecutor's office.

We do not address the defendants' arguments regarding the fallibility of eyewitness testimony in general. It is not clear they raised these arguments before the motion judge. The defendants may raise them on remand.

[18]It is true that even without the new DNA evidence, the minute quantity of presumptive blood on the sneakers revealed by the phenolphthalein testing offered the defendants an opportunity to argue at the second trial that what was found on DiBenedetto's sneakers was inconsistent with what could be expected to be found if DiBenedetto were the third shooter. See *DiBenedetto* v. *Hall*, 272 F.3d at 12 (discussing evidence at second trial: "The sneakers showed no visible signs of blood, itself surprising given the number of times the victims were shot at close range"). But the argument might have a qualitatively different impact when it is no longer considered as a defense to evidence suggesting one or both victims' blood was present on the sneakers, but is presented in the context of DNA evidence indicating the victims' blood was *not* present.

[19]There is also a strategic reason why the new DNA evidence is significant. In the defendants' second trial, they were in the position of needing to minimize the importance of the Commonwealth's phenolphthalein test evidence and to discredit the inferences argued by the Commonwealth that there was blood on DiBenedetto's sneakers, that it belonged to one of the victims, and that therefore Schindler was correct in identifying DiBenedetto as the third shooter. If the defendants were able to introduce the DNA evidence and Hanniman's opinions concerning its significance, the Commonwealth would be placed in a

Nevertheless, we do not here conclude that a new trial is necessarily called for on account of the proffered DNA evidence. The motion judge did not address the specifics of the defendants' claim that their proffer constituted independent, exculpatory evidence, stating only that the strength of the Commonwealth's case "overwhelm[ed] the nominal exculpatory value of the 2004 DNA test results." Certainly the strength of the prosecution's case "may weaken the effect of evidence which is admittedly newly discovered." *Grace*, 397 Mass. at 306. But some of the judge's stated reasons for finding the case strong here are open to question. He stated that Schindler had testified at the second trial, eight years after the murders, that "he was still able to visualize the incident and that he remembered the defendants as they appeared on the night of the murders"; the judge also emphasized that both Schindler's and Storella's eyewitness accounts of "how the shootings occurred were further corroborated by the testimony of the medical examiner and the ballistician." As the defendants point out, the fact that one has a memory of the way someone looked eight years earlier does not necessarily mean the memory is accurate. Cf. *Commonwealth* v. *Kater*, 388 Mass. 519, 527-528 (1983) ("Memory is said not to be like a videotape, which accurately records every perception and needs merely to be played back"). And the fact that the medical examiner and ballistician corroborated Schindler's and Storella's accounts of the shootings themselves says nothing about whether their — and Schindler's in particular — identifications of the individual shooters were accurate.

We conclude that it is necessary to remand the case for further findings by the motion judge concerning the proffered DNA evidence and its importance to the defendants' claim DiBenedetto was not the third shooter in light of the evidence presented at trial. Cf. *Grace*, *supra* at 308-309 (remand to motion judge necessary for further findings concerning her reasons for granting defendant's motion for new trial). A remand is particularly appropriate here because of the fact that the motion judge was

_____

position of seeking to minimize the significance of the fact that DiBenedetto's sneakers definitely did *not* have either victim's blood on them and the resulting inference that DiBenedetto therefore was not the third shooter. The evidence thus has a capacity to change the trial dynamic in a way that certainly would be helpful to the defense.

the trial judge with a thorough knowledge of the trial proceedings and who had the opportunity to observe the trial witnesses firsthand. We further conclude that, if the Commonwealth so requests, an evidentiary hearing would be appropriate on remand to permit examination into the scientific reliability of (1) Hanniman's conclusion that if the victims' blood had been on the Nike sneakers, DNA would remain eighteen years later; and (2) her determination that from the "weak and incomplete genetic profiles" obtained from the DNA on the sneakers, she could conclusively exclude the two victims as the source. Cf. *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26 (1994), citing and quoting *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-595 (1993).[20]

c. *Judicial estoppel.* The defendants argue that the Commonwealth has adopted inconsistent positions at different stages of these proceedings in violation of the doctrine of judicial estoppel. We disagree.

" 'The purpose of the doctrine [of judicial estoppel] is to prevent the manipulation of the judicial process by litigants.' *Canavan's Case*, 432 Mass. 304, 308 (2000). As an equitable doctrine, judicial estoppel is not to be defined with reference to 'inflexible prerequisites or an exhaustive formula for determining [its] applicability.' *New Hampshire* v. *Maine*, 532 U.S. 742, 751 (2001). Rather, the doctrine is properly invoked whenever a 'party is seeking to use the judicial process in an inconsistent way that courts should not tolerate.' *East Cambridge Sav. Bank* v. *Wheeler*, 422 Mass. 621, 623 (1996)." *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. 634, 640 (2005). "[T]wo fundamental elements are widely recognized as comprising the core of a claim of judicial estoppel. First, the position being asserted in the litigation must be 'directly inconsistent,' meaning 'mutually exclusive' of, the position asserted in a prior proceeding[;] . . . [and] [s]econd, the party must have succeeded in convincing the court to accept its prior position." (Citations omitted.) *Id.* at 640-641, quoting and citing *Alternative Sys. Concepts, Inc.* v. *Synopsis, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004).

The defendants argue that the first element is satisfied here

[20]As previously stated, see note 11, *supra*, the Commonwealth also may raise the issue whether the new DNA evidence qualifies as newly discovered.

because the Commonwealth's current position that the sneaker evidence had little probative value is inconsistent with the prosecutor's closing argument, which asked the jury to infer that the substance on the sneakers was Chiuchiolo's blood. The argument fails. The prosecutor did emphasize the inculpatory inferences to be drawn from the sneaker evidence, but also stated that this inference was not meant to "be the be-all and end-all" but rather was "meant to offer you a small bit of corroboration." The argument that the sneaker evidence was relevant to corroborate other testimony based on certain inferences the jury may have drawn is not "directly inconsistent" with the Commonwealth's current position that the sneaker evidence at trial was ambiguous. Instead, at trial, the prosecutor urged the jury to accept a permissible inference drawn from inconclusive evidence. Because there is no direct inconsistency in the Commonwealth's position, the defendants' claim of judicial estoppel fails. See *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. at 641 ("We have rejected claims of judicial estoppel where the position being asserted is not directly contrary to the position previously asserted").

d. *Costa*. The new DNA evidence of course relates solely to DiBenedetto's shoes. The Commonwealth takes the position that even if DiBenedetto is entitled to a new trial, Costa is not. Costa argues, however, that the new DNA evidence warrants a new trial for him as well as DiBenedetto because they were tried as joint venturers, the sneaker evidence ultimately was admitted (and argued by the prosecutor) against him, and this evidence affects the strength of the Commonwealth's entire case against all defendants.

The motion judge did not consider whether Costa stands in a different place than DiBenedetto, considering both defendants as a unit. This fact and Costa's arguments about his right to pursue his motion for a new trial along with DiBenedetto persuade us that Costa should be able to participate as a party to further proceedings on remand. The Commonwealth may raise there its claim that the new DNA evidence has no effect on Costa's convictions.

3. *Conclusion*. The order denying the defendants' motions for a new trial is vacated. The cases are remanded to the Superior

Court for further consideration of those motions in a manner consistent with this opinion.

*So ordered.*