# United States Court of Appeals
## For the First Circuit

_____

No. 00-2279


FRANK DIBENEDETTO,

Petitioner, Appellant,

v.

TIMOTHY HALL, ET AL.,

Respondents, Appellees.

_____


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]


_____


Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
and DiClerico*, District Judge.


_____


Wendy Sibbison, for appellant.
William J. Meade, Assistant Attorney General, with whom Thomas
F. Reilly, Attorney General, was on brief, for appellees.

_____

*    Of the District of New Hampshire, sitting by designation.

**LYNCH, Circuit Judge**. Frank DiBenedetto appeals the district court's denial of his habeas corpus petition challenging the constitutionality of his state conviction for a double homicide more than a decade ago.  See Commonwealth v. DiBenedetto, 427 Mass. 414, 693 N.E.2d 1007 (1998).  He is serving a life sentence.

DiBenedetto presents two claims, arguing that the determination of the Massachusetts Supreme Judicial Court (SJC) on these issues is in error on de novo review and, additionally, that it was contrary to, or an unreasonable application of, clearly established Supreme Court rulings of constitutional law. 28 U.S.C. § 2254(d) (Supp. II 1996).  DiBenedetto's first claim is that the trial court's refusal to allow him to present evidence that he believed would undermine the key witness for the prosecution violated his rights under the Sixth Amendment of the United States Constitution.  His second claim is that the prosecution's testing, resulting in the destruction, of physical evidence that may have been exculpatory violated his rights under the Sixth and Fourteenth Amendments.  In addition, his case raises questions about the standards by which federal

-2-

courts ruling on state prisoners' habeas petitions review state court decisions that do not, apparently, decide the federal constitutional claims raised.

We affirm the denial of habeas relief, aided by the very helpful decision of the district judge, and, in light of an intervening decision of this court, clarify the standard of review to be applied to state court decisions under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") Pub. L. No. 104-132, 110 Stat. 1214, when the state court does not decide the federal constitutional claim.

I.

The petitioner DiBenedetto was charged with the 1986 murders of Frank Chiuchiolo and Joseph Bottari. All reportedly had connections to the La Cosa Nostra organized crime group. The bodies of the two victims were found in a park in Boston's North End. Chiuchiolo had been shot seven times, including five shots to the head, and Bottari had been shot sixteen times, including six shots to the head. Each had been shot by three separate guns. DiBenedetto was tried jointly with codefendant Louis Costa, while a third individual, Paul Tanso, was tried separately. The jury found DiBenedetto guilty of two counts of

-3-

first degree murder on charges of deliberate premeditation and extreme atrocity and cruelty.  Costa was also convicted of first degree murder, while Tanso was acquitted.

The prosecution's evidence against DiBenedetto consisted primarily of: 1) the testimony of Richard Storella, a fully immunized witness who claimed to have been present at the shooting and involved in luring the victims to the scene; 2) the testimony of Joseph Schindler, a lawyer, who observed the shootings from the window of his third floor apartment overlooking the park; and 3) DiBenedetto's sneakers, one of which had trace amounts of something that may have been human blood.  DiBenedetto's arguments on this appeal relate to the first and third pieces of evidence.

Storella's testimony was key to the prosecution's case. Storella testified that he and the victims had agreed to rob DiBenedetto, a drug dealer and one of Storella's best friends, of cocaine.  The plan was for Storella to arrange a buy, and the two others to show up and rob DiBenedetto.  Storella says he later decided to inform DiBenedetto of the planned robbery and DiBenedetto instructed him to set up the buy as planned.  When the victims arrived at the park intending to rob DiBenedetto,

-4-

DiBenedetto and his accomplices were armed and waiting to gun them down. Prior to the trial, Storella had given various inconsistent statements to the police, in depositions, and to the grand jury, including one statement where he confessed to being the killer himself. However, in all Storella's versions except his initial denial of any knowledge of the shootings, DiBenedetto was one of the shooters.

DiBenedetto's claim is that he was unconstitutionally precluded from introducing evidence of the defense theory that he was being set up by Storella to take the fall for a mob hit, and that Storella, despite being immunized, was lying in order to "curry favor" with lead players in the La Cosa Nostra, whom Storella had previously angered. More specifically, DiBenedetto's theory was that these killings were "fallout" from the mob-ordered murder of Vincent Limoli, three and a half months prior to the killings at issue here. Limoli, like the victims here, was shot during what was set up as a drug purchase in the same section of the North End. See United States v. Barone, 114 F.3d 1284, 1289-91 (1st Cir. 1997) (describing Limoli murder). He argues that the Limoli murder was retribution for Storella and Limoli's robbery of a "made" mob

member in 1985 and that the two victims in this case had angered the La Cosa Nostra leadership over their actions in connection with the Limoli murder: Bottari by refusing to act as Limoli's executioner, and Chiuchiolo by breaking the code of silence to tell his sister (Limoli's girlfriend) details of the killing. DiBenedetto claims that the two victims were killed by the La Cosa Nostra in retaliation for their disobedience, and that Storella, fearing for his own life due to his involvement in the robbery that precipitated all this, was under mob orders to cover up the real story behind the killings. He argues that the trial judge violated his constitutional rights by not allowing him to present evidence of, or cross-examine Storella regarding, the Limoli murder fallout theory.

The sneakers, along with the claimed evidence of blood, form the basis of DiBenedetto's second habeas claim. The witness Schindler had identified the shoes as the ones DiBenedetto was wearing at the shooting. For years following the arrest, the Commonwealth maintained that there was no evidence of blood on the sneakers, and so the prosecution would not use them as evidence. This was the prosecution's position in the pretrial conference report. Less than a week before the

-6-

second trial was scheduled to begin, on New Year's Eve day, the prosecution conducted its first swab test on the sneakers, which resulted in a positive result on the left sneaker, indicating a small spot of "what was either the blood of a human or some other animal or perhaps certain plant peroxidases." DiBenedetto, 693 N.E.2d at 1011. In the process of testing, the sneaker was cleaned of any trace of blood. DiBenedetto's experts were unable to replicate the test on the left sneaker, but did obtain a positive swab result on the other shoe, where the prosecution's swab test had found nothing. The challenge to the sneaker evidence has two components. First, DiBenedetto argues that the test, conducted in violation of the pretrial conference report, violated his due process rights. Second, he argues that the sneakers were exculpatory evidence which the prosecution did not take sufficient steps to prevent from becoming contaminated and destroyed in the process of testing.

II.

This case has been to the SJC twice. On DiBenedetto's first appeal, the SJC reversed the murder conviction because the witness Storella had been unavailable to testify and the trial judge erroneously admitted his recorded testimony as evidence

-7-

against DiBenedettto. Commonwealth v. DiBenedetto, 414 Mass. 37, 605 N.E.2d 811, 815-16 (1992). At DiBenedetto's second trial, Storella did testify and DiBenedetto was again convicted of murder in the first degree. DiBenedetto again appealed to the SJC, presenting the claims that he presents here on habeas, as well as many additional claims not argued here. The SJC affirmed the conviction, albeit apparently without considering either claim as a federal constitutional claim. DiBenedetto, 693 N.E.2d 1007 (1998).

On the exclusion of evidence concerning the Limoli murder, the SJC affirmed the trial court's conclusions that, as a matter of state law, the Limoli killing was too remote to be relevant and that the evidence was too complicated and would divert the jury's attention. The SJC concluded that DiBenedetto had proffered no evidence, other than speculation, that anyone else had a motive to kill Chiuchiolo and Bottari, or to show that the murders were sufficiently similar. Similarly, the SJC concluded that the trial judge did not abuse his discretion in barring cross-examination of Storella regarding the Limoli murder and his alleged fear of retribution from the La Cosa

Nostra. The SJC did not discuss the Sixth Amendment implications of these decisions.

With regard to the admission of the evidence indicating the possible presence of blood on one of DiBenedetto's sneakers, the SJC relied on its precedent in Commonwealth v. Willie, 400 Mass. 427, 510 N.E.2d 258 (1987), which held that "when potentially exculpatory evidence is lost or destroyed, a balancing test is employed . . . . The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." Id. at 261. Based on this balancing test, the SJC held that there was "no doubt that the Commonwealth failed to comply with the pretrial conference report," but that DiBenedetto "failed to demonstrate that [he was] prejudiced by [the] testing of the sneakers for blood." DiBenedetto, 693 N.E.2d at 1011. Again, the SJC decision cited only Massachusetts judicial decisions and did not discuss the federal constitutional claims that were raised.

### III.

Under the standard established in AEDPA, a habeas petition may not be granted "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the

state court decision: 1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or 2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (Supp. II 1996). A state court's findings on factual issues "shall be presumed to be correct" and the petitioner bears the burden of disproving factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e).

In this case, the proper application of the AEDPA standard warrants further discussion. In the district court, DiBenedetto argued that, because the SJC's decision does not discuss DiBenedetto's constitutional claims or federal constitutional case law, these claims should be reviewed de novo by the federal courts. The district court rejected this argument.

The district court cited to 28 U.S.C. § 2254(d)(1) stressing the words "resulted in" and "involved" to support its conclusion that the state court's ultimate holding, not its rationalization process, is what matters under AEDPA. DiBenedetto v. Hall, No. 99-10843, slip op. at 9 (D. Mass. Aug.

-10-

25, 2000). It is correct that when the state court has addressed the federal constitutional issue, it is its ultimate outcome, and not its rationalization, which is the focus. See Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir.), cert. denied 122 S.Ct. 282 (2001). But that does not mean the deferential standard applies where the state court has not addressed the constitutional issue.

In our view, the critical point is the preceding clause in the statute, which states that the deferential standard used applies to claims that were "adjudicated on the merits" in the state courts. 28 U.S.C. § 2254(d). If the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues), then we cannot say that the constitutional claim was "adjudicated on the merits" within the meaning of § 2254 and therefore entitled to the deferential review prescribed in subsection (d). This was the holding of our recent decision in Fortini v. Murphy, which forecloses the district court's approach here. 257 F.3d 39, 47 (1st Cir. 2001) ("[W]e can hardly defer to the state court on an issue that the state court did not address."); accord Hameen v. Delaware, 212 F.3d 226, 248

-11-

(3d Cir. 2000) (applying pre-AEDPA independent review of constitutional claim where state court decision rested on state statutory construction), <u>cert. denied</u>, 121 S.Ct. 1365 (2001).

Faced with state court opinions that do not discuss constitutional claims raised by the defendant, the <u>Fortini</u> approach requires that federal courts apply de novo review to the federal constitutional claims raised in habeas petitions.

Because the SJC chose to decide both issues on state law grounds, we review both de novo.[1] As to the first claim, we particularly note that the Commonwealth, arguing that the SJC findings that the Limoli murder was too "remote" and not "sufficiently similar" are state law determinations,[2] has taken

---

[1] Whether or not the state court has decided the federal claim on the merits, any factual determinations that it makes -- even if they relate solely to an independent state claim -- remain entitled to the presumption set forth in 28 U.S.C. § 2254(e)(1) insofar as they may be useful in consideration of the federal claim. In some cases, the outcome of the federal claim may be determined by these factual conclusions drawn by the state court.

[2] For instance, Massachusetts seems to require that, in order for evidence of potentially exculpatory third-party crimes to be introduced, the prior crimes must be very close in time to the crime charged, which is not typically required in federal cases. <u>Compare</u> <u>DiBenedetto</u>, 693 N.E.2d at 1012, <u>and</u> <u>Commonwealth</u> v. <u>Rosa</u>, 422 Mass. 18, 661 N.E.2d 56, 60 (1996) (crimes must be "closely connected in point of time"), <u>with</u> <u>Barone</u>, 114 F.3d at 1296 (crimes committed ten years prior to the crime charged admitted under federal rules), <u>and</u> <u>Holt</u> v.

-12-

the position that the state rule is an independent rule to which we must give deference.  Taken to its logical conclusion, this argument confirms that the SJC discussion of the evidentiary claim does not address the federal rule, even implicitly.

IV.

The first question is whether the trial court's decision to exclude evidence supporting a defense theory was in error as a matter of federal constitutional law.

Limoli Murder Fallout Theory

DiBenedetto argues that his right to present a defense was severely compromised by the trial court's refusal to allow evidence or cross-examination concerning the alleged mob murder of Limoli and the ensuing fallout.  He maintains that this was crucial on two fronts: both to showing that others had motive to kill the victims and were the most likely killers, and to showing that the immunized witness Storella was biased, in that he feared retaliation from the La Cosa Nostra if he did not testify against DiBenedetto.  DiBenedetto argues, as he must in

_____

United States, 342 F.2d 163 (5th Cir. 1965) (crimes committed more than six months prior to crime charged admitted under federal rules).

a habeas petition, that this refusal rises to the level of violating his constitutional rights, including his Sixth Amendment right to present a defense and confront witnesses against him and his Fourteenth Amendment due process rights.

A.  Compulsory Process Claim

DiBenedetto claims that his Sixth Amendment right to compulsory process was violated by the trial judge's refusal to allow him to present any evidence regarding the Limoli murder, some three and a half months prior to the murders at issue in this case, and the connection of the victims and key prosecution witness to Limoli's murder.

We start with a statement of the federal rule.  Under the Sixth Amendment Compulsory Process Clause, criminal defendants generally have the right to present "competent, reliable . . . exculpatory evidence." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (state rule excluding evidence concerning means by which a voluntary confession was obtained violated Sixth Amendment); also Chambers v. Mississippi, 410 U.S. 284, 295-96 (1973) (application of state hearsay rule to bar testimony regarding third party's repeated confession of crime violated defendant's Sixth Amendment rights).  Nonetheless, as

-14-

we pointed out in Fortini, the Supreme Court cases undoing state court convictions based on exclusion of evidence involve egregious situations "and the more recent decisions of the Court . . . create serious doubts that the Court is interested in carrying the doctrine beyond egregious cases."  257 F.3d at 46.

In one of its more recent cases, the Supreme Court held that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," including the state's "legitimate interest in ensuring that reliable evidence is presented," and evidentiary exclusions will not violate the constitution "so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

DiBenedetto first offered the mob fallout theory on the basis that it tended to show that third-party culprits, not DiBenedetto and his codefendant, were guilty.  Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant.  Id. at 21.  The

-15-

trial judge found the connection too attenuated, holding that the evidence tended to show the Limoli murder was committed by two men who were not in Massachusetts on the date of the Chiuchiolo-Bottari murders and there was no evidence to show the two were involved. The defense then further refined its theory, arguing that the reason Limoli was murdered -- stealing from a mob member -- applied just as well to Storella, whose life was spared, but who was left in the unenviable position of owing a favor to the mob. Both victims here had defied the La Cosa Nostra leadership, like Limoli, giving the mob reason to execute them. The trial court considered this to be a different motive than the one provided by Storella for the murder, but one that did not exclude DiBenedetto as the executioner. Further, the trial judge found, assuming that Limoli had been ordered executed, that there was no evidence of any such order as to these victims. And the trial judge viewed this as raising an issue that would divert the jury from the central issue.

Whether evidence is too speculative involves a subset of other questions. Here, the state courts said the two crimes were too remote and dissimilar and so the connection was

-16-

speculative.[3]  We are doubtful: the crimes were only three and

a half months apart, showed certain commonalities of modus

operandi, had one overlapping main character, and a background

chorus of the same criminal group.  A trial judge could easily

have decided to admit this evidence.  See Barone, 114 F.3d at

1296 (crimes committed ten years prior to the crime charged

admitted under federal rules); Holt v. United States, 342 F.2d

163 (5th Cir. 1965) (crimes committed more than six months prior

to crime charged admitted under federal rules).  If those were

the only objections to the evidence, then the trial judge's

decision to exclude might be questionable.  But there were other

objections -- most importantly, that the only actors in this

scenario that the defense was able to actually name (the Limoli

killers) could not possibly have been the killers here.  And so

---

[3]    The Commonwealth argues that the SJC findings of remoteness and dissimilarity are either fact findings or  state law determinations.   Both arguments miss the point of DiBenedetto's claim.   The question is not whether the SJC correctly determined the Massachusetts state law regarding cross-examination, but rather whether its application in this case violates the defendant's Sixth Amendment rights.  Further, these sorts of conclusions -- remoteness and similarity -- are mixed questions of law and fact, which receive the same level of deference as legal rulings.  Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000).

the trial judge was left only with the murky figures of unnamed mob killers, whose existence in the shadows could possibly, but not likely, be inferred from a complicated tale of the murder of Vincent Limoli.

Further, the speculative nature is only the start of the problem. There were at least two other difficulties with allowing the Limoli murder into evidence: that evidence would disparage the victims here as bad people, deserving of death, and it would pose a real danger of distracting the jury from the case before it. The trial judge, who was better situated than we to have a feel for the evidence, thought the proposed evidence would create both these problems.

In United States v. Levy-Cordero, 67 F.3d 1002, 1013 (1st Cir. 1995), we explained that the defendant's Sixth Amendment rights "must be weighed against countervailing public interests," which include the factors outlined by the Supreme Court in Taylor v. Illinois, 484 U.S. 400 (1988). The Taylor factors include "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice

-18-

to the truth-determining function of the trial process." Id. at 414-15. The trial judge's concerns here go to the truth-determining function of the trial, a valid concern under the Taylor test.

It is a stretch to say that the evidentiary ruling amounted to a constitutional violation. The SJC's affirmance of the trial court's ruling does not reach the level of a constitutional violation of a defendant's right to present exculpatory evidence. See Chambers, 410 U.S. 284 (1973); Pettijohn v. Hall, 599 F.2d 476, 480-81 (1st Cir. 1979). "The defendant's right to compulsory process is itself designed to vindicate the principle that the 'ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.'" Taylor, 484 U.S. at 411, (quoting United States v. Nixon, 418 U.S. 683, 709 (1974)). This combination of unreliability, disparagement, and the tangential nature of the evidence is sufficient to uphold the trial judge's decision against constitutional challenge. Thus, using the Taylor balancing factors, DiBenedetto had no right under the Sixth Amendment to present evidence concerning the victims' ties to the Limoli murder and to the mob generally.

-19-

B.  Cross-Examination of Storella for Bias

We also ask whether DiBenedetto has made out a constitutional claim as to the inability to cross-examine Storella concerning his connection to the mob.  The Supreme Court has recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  Davis v. Alaska, 415 U.S. 308, 316-17 (1974).  "[B]ias is 'always relevant as discrediting the witness and affecting the weight of his testimony.'"  United States v. Lynn, 856 F.2d 430, 432 (1st Cir. 1988) (quoting United States v. Tracey, 675 F.2d 433, 437 (1st Cir. 1982)).  However, the Supreme Court has also held that the Confrontation Clause does not

> prevent[] a trial judge from imposing any limits on
> defense counsel's inquiry into the potential bias of
> a prosecution witness . . . . [T]rial judges retain
> wide latitude . . . to impose reasonable limits on
> such cross-examination based on concerns about, among
> other things, harassment, prejudice, confusion of the
> issues, the witness' safety, or interrogation that is
> repetitive or only marginally relevant.

Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

Van Arsdall sets forth the test for determining whether a limitation on cross-examination violates the Confrontation

Clause. The first question to be asked under the Van Arsdall test is whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? Id. at 679-80; see also United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986) (limitation on questions regarding witness's commission of two murders, giving him motive to cooperate with government, not prejudicial because cross-examination had established that he received a favorable sentencing recommendation in exchange for testimony). The second element of the Van Arsdall test is whether the error was harmless beyond a reasonable doubt; if so, reversal is not warranted. Van Arsdall, 475 U.S. at 681.

Two decisions of this Court provide guidance in this case. In Lynn, we were confronted with the question of whether a trial court's complete foreclosure of cross-examination "into a relevant and not fully explored area" violated the defendant's Sixth Amendment rights. Lynn, 856 F.2d at 433-34. We held that, to meet the constitutional standard, the trial court "must ensure that the jury is provided with 'sufficient information concerning formative events to make a "discriminating appraisal"

-21-

of a witness's motives and bias.'"  Id. at 433 (quoting Twomey,
806 F.2d at 1140 (quoting United States v. Campbell, 426 F.2d
547, 550 (2d Cir. 1970))).  We concluded that, "[w]hile the
cross-examination . . . was extensive, there were relatively few
questions concerning [the witness's] continuing reasons to lie
to please the government" and therefore the constitutional
standard had not been met.  Id. at 433-34.

However, our decision in Lynn must be viewed next to
our decision on the habeas petition presented in Bui v. DiPaolo,
170 F.3d 232 (1st Cir. 1999), where we held that the
Confrontation Clause does not give a defendant the right to
cross-examine regarding "every conceivable theory of bias."  Id.
at 242.  Rather, "[t]he threshold requirement imposed by the
Confrontation Clause is satisfied as long as the defendant is
given a fair chance to inquire into a witness's bias."  Id.; see
also United States v. Boylan, 898 F.2d 230, 254 (1st Cir. 1990)
("So long as a reasonably complete picture of the witness'
veracity, bias, and motivation is developed, the judge enjoys
power and discretion to set appropriate boundaries.").  In Bui,
we observed that a trial judge may circumscribe cross-
examination if the party is unable to lay a proper evidentiary

-22-

framework; where the offer is "inherent[ly] speculative[]," the trial judge may "prohibit[] cross-examiners from mounting fishing expeditions." 170 F.3d at 244; see also United States v. Zaccaria, 240 F.3d 75, 82 (1st Cir. 2001) (refusal to allow inquiry into witness's drug trafficking, based solely on alleged admission to defendant, did not violate Confrontation Clause because "some proof in the form of concrete facts must underlie any offering that can be accepted by a trial court as evidence"). The question here is whether the bias alleged by DiBenedetto falls more within the ambit of the Lynn case, or the Bui case. The Commonwealth argues that Bui controls, while DiBenedetto cites Lynn. The SJC held that Storella had been sufficiently cross-examined as to his credibility, based on his repeated lies to investigating authorities, and as to bias, based on his need to cooperate with the government to avoid being charged with the murder himself. DiBenedetto, 693 N.E.2d at 1012. However, the bias alleged by DiBenedetto is bias of a different nature -- although Storella was cross-examined on bias towards the government, he was not cross-examined on bias towards a third party -- namely, the La Cosa Nostra leadership.

Third-party bias is a proper topic for cross-examination. See United States v. Abel, 469 U.S. 45, 50-52 (1984).

Nonetheless, the defense did have the opportunity to cross-examine Storella generally as to his motivation in developing the countless variations and embellishments to his account. Both defense counsel repeatedly asked Storella what he was afraid of, or what his concern was, at the time he gave his statements to the investigating authorities. Storella repeatedly answered that he was afraid of being charged with conspiracy to murder, never once indicating that he was concerned with breaking the La Cosa Nostra code of silence or otherwise angering the mob. Storella also testified under cross-examination that he was afraid of Bottari and Chiuchiolo because of their connections to "a few known figures" in the North End, indicating that, at least in his view, these two were not on the outs with the La Cosa Nostra leadership. Like the voir dire in the Bui case, Storella's responses to the general cross-examination questions indicate that Storella was not likely to provide the defendant with the answers he was seeking through more specific cross-examination on the Limoli murder. Based on the extensive questioning by the two defense attorneys

-24-

regarding Storella's motives and credibility, and the speculative nature of the proffered line of inquiry, the trial judge did not offend DiBenedetto's Sixth Amendment rights in excluding cross-examination on the Limoli murder, even as to bias.

V.

Destruction of Potentially Exculpatory Evidence

DiBenedetto's second habeas claim is that his due process rights were violated by the introduction of evidence resulting from the prosecution's testing of his sneaker, which was conducted at the start of a holiday weekend less than a week before the second trial was scheduled to begin, and which foreclosed complete testing by his own expert. There are two prongs to this claim. First, DiBenedetto argues that the testing and introduction of the sneakers as evidence violated the Pre-Trial Report, which required that the prosecution give the defense notice of any testing and an opportunity to examine any material evidence. He alleges the contravention of the Pre-Trial report constitutes a due process violation. Second, he claims that the sneakers were exculpatory evidence, which the prosecution had a duty to preserve. The arguments concerning

the sneakers are weak and it is difficult to imagine the sneaker evidence played much of a role in the jury's determination.

The sneakers were seized by the police four days after the murder.  The lawyer Schindler, in testimony the jury could have discounted, said he saw the brand name symbol on the sneakers of one of the murderers from his third floor window on that dark night.  His testimony tied the sneakers to the event. The sneakers showed no visible signs of blood, itself surprising given the number of times the victims were shot at close range. When the prosecution tested the sneakers, it found a spot on the left sneaker, but not the right.  When the defense tested the shoes a week later, it found a spot on the right sneaker, but not the left.  The prosecution's expert testified this was not surprising as to the left sneaker, as its swab test on the left sneaker had removed the spot.  This removal of the stain gives rise to DiBenedetto's destruction of evidence claim.  The SJC rejected this claim, finding that DiBenedetto had failed to demonstrate prejudice, as there was "little doubt that one or both the . . . sneakers tested positive."  <u>DiBenedetto</u>, 693 N.E.2d at 1011.

A.  Violation of Pre-Trial Order

DiBenedetto's claim that the violation of the pretrial procedures violates his constitutional due process has little merit. The SJC held that, although "[t]here is no doubt that the Commonwealth failed to comply with the pretrial conference report," it was immaterial as there was no prejudice to DiBenedetto. Id. at 1011. Violations of state procedural rules will not constitute a federal due process violation unless they violate fundamental notions of fairness. See, e.g., Brown v. Maloney, No. 00-2556, 2001 WL 1181109 (1st Cir. Oct. 11, 2001); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Given the questionable evidentiary value of the sneaker for either the defense or the prosecution, neither the testing nor introduction of the evidence creates a situation of fundamental unfairness, no matter how unsavory the prosecution's tactics.

B.  Exculpatory Evidence

The second aspect of DiBenedetto's claim, based on the destruction of potentially exculpatory evidence, is controlled by clearly established federal law, set forth by the Supreme Court in Arizona v. Youngblood, 488 U.S. 51 (1988), and California v. Trombetta, 467 U.S. 479 (1984). In Youngblood, the Supreme Court held that the police's failure to preserve

-27-

potentially exculpatory semen evidence in a rape case was not a due process violation unless the police had acted in bad faith. 488 U.S. at 337-38. Nonetheless, simple good faith is not a complete exoneration. See United States v. Alston, 112 F.3d 32, 35 (1st Cir. 1997) ("We are not prepared to say that the government's 'good faith' is always and everywhere a complete defense to a due process claim where the government deliberately alters evidence that might otherwise have exculpated the defendant.").

DiBenedetto argues that the prosecution's last minute testing of the sneakers, without notice to the defense and in apparent contradiction of its pretrial report, is evidence of bad faith. We need not decide whether this meets the "bad faith" standard, because a closer look at the Supreme Court decision in Trombetta indicates that DiBenedetto's due process claim falls short in other regards.

The rule established in Trombetta was that, in order to warrant reversal, destroyed "evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and must also be of such a nature that the defendant would be unable to obtain comparable evidence by other

-28-

reasonably available means." 467 U.S. at 479-80. The defendant claims that the sneaker's lack of blood was clearly exculpatory because it was highly unlikely that he could have shot the victims multiple times at close range without soiling his sneakers. However, given that the sneaker tested positive for blood or other organic matter, it ceased to be clearly exculpatory. Moreover, the defendant was free to cross-examine the prosecution's expert on the lack of any blood stains visible to the naked eye, which goes more to the heart of the potentially exculpatory nature of the sneakers.

Further, the Trombetta court, in holding that the results of a breath-analysis blood alcohol test could be introduced at trial even if the breath samples were not preserved, noted that the "evidence to be presented at trial was not the breath itself but rather the [test] results obtained from the breath samples," which the defendants could have attempted to impeach by challenging the calibration and overall reliability of the instrument. Id. at 488, 490. Similarly, in this case, the evidence to be presented was not the spot itself, but rather the test results, which the defendant was free to impeach by questioning the expert about the test methodology,

-29-

the inconsistent results, and, most importantly, about the test's inability to conclude that the spot was even human blood.

There was no constitutional violation.

## VI.

Conclusion

The district court's denial of DiBenedetto's petition for habeas corpus is affirmed.