Mulligan, Robert A., J.
In February 1994, a jury convicted defendant Frank DiBenedetto of murder in the first degree of Frank Chiuchiolo and Joseph Bottari based on theories of deliberate premeditation and extreme atrocity or cruelly. The jury also convicted codefendant Louis Costa of deliberately premeditated murder in the first degree of Chiuchiolo and Bottari. The convictions arose out of the February 19, 1986, double homicide in Slye Park, in the North End section of Boston.[1]
On direct appeal, the Supreme Judicial Court affirmed the defendant’s convictions and denied him relief under G.L.c. 278, §33E. Commonwealth v. DiBenedetto, 427 Mass. 414, 416 (1998). The United States District Court for the District of Massachusetts denied the defendant’s subsequent petition for a writ of habeas corpus, DiBenedetto v. Hall, 176 F.Sup.2d 45, 66 (D.Mass. 2000), and the United States Court of Appeals for the First Circuit affirmed that denial, DiBenedetto v. Hall 272 F.3d 1, 13 (1st Cir. 2001), cert. denied, sub nom. DiBenedetto v. Spencer, 535 U.S. 1024 (2002).
RECENT PROCEDURAL HISTORY
In 2005, the defendant filed a motion for a new trial pursuant to Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), based on what he alleged was newly discovered evidence: the results of deoxyribonucleic acid (DNA) testing performed in 2004 on the sneakers he was wearing when arrested approximately four days after the killings. An eyewitness had testified at the defendant’s trial that the sneakers seized by police “look[edI similar to the footwear (the defendant] was wearing on [the date of the crimes].” The defendant supported his motion in part with an affidavit in which a forensic serologist stated that the DNA testing excluded both victims as contributors to the DNA which the serologist had found in certain sampled areas on the defendant’s sneakers.[2]
The defendant primarily argued that the 2004 DNA test results entitled him to a new trial because that evidence undermined the argument made by the Commonwealth at trial that there was blood on the sneakers and, inferentially, that, the blood had come from one or both of the victims. The defendant also argued that he was entitled to a new trial because the non-match between the DNA found by the serologist and the DNA of the victims permitted an inference to be drawn that the defendant was not the person witnessed repeatedly shooting one or both the victims from close range.
In January 2009,1 denied the motion without reaching the question whether the defendant had met his burden to establish that the 2004 DNA test results had “the characteristics necessary to qualify as newly discovered evidence that could warrant granting a new trial,” Commonwealth v. LeFave, 430 Mass. 169, 181 (1999). See Commonwealth v. Grace, 397 Mass. 303, 307 (1986) (“If the motion judge concludes that the moving parly has failed to establish one aspect of the burden, the judge need not... consider the other”).[3] I concluded that the defendant had failed to establish the other aspect of his burden — showing the importance of the newly proffered evidence. See id. at 305-06.
As to the defendant’s first argument, I agreed with the observation made by the Supreme Judicial Court on direct appeal that the forensic testimony at the defendant’s trial regarding his sneakers was “marginally instructive,” Commonwealth v. DiBenedetto, 427 Mass. at 416, and with that made by the First Circuit Court of Appeals that this evidence doubtfully “played much of a role in the juiy’s determination,” DiBenedetto v. Hall 272 F.3d at 12. Given that the phenolphthalein test result evidence had questionable importance to the Commonwealth’s case, I concluded that the 2004 DNA test results, to the extent that they further questioned the value of the phenolphthalein test evidence to the Commonwealth’s case, could not have been a real factor in the juiy’s deliberations. I observed firsthand how the evidence regarding the phenolphthalein testing played out at the defendant’s trial. With the benefit of being able to judge the evidence *281 from that perspective, I concluded that this evidence was not of significant consequence at trial to the juiy’s assessment of the defendant’s guilt. Excluding the phenolphthalein test result evidence and the attendant inference argued from it by the Commonwealth in summation would not have appreciably altered the calculus of deliberation. See, e.g., Commonwealth v. Lykus, 451 Mass. 310, 326 (2008), citing Commonwealth v. Grace, 397 Mass. at 305-06 (“The task of the motion judge is to decide whether the new evidence probably would have been a real factor in the jury’s deliberations, and in that regard the judge must consider the strength of the case against the defendant”).
I also summarily rejected the defendant’s follow-on argument.[4] The defendant argued that, given the evidence at trial of the sanguinary nature of the homicides and the evidence that one or both of the victims was repeatedly shot from close range, the absence of either victim’s DNA in the sampled portions of his (the defendant’s) sneakers could permit an inference that he was not the person witnessed shooting from close range. On the defendant’s showing, that negative inference lacked persuasive force. Even assuming the reliability of the forensic serologist’s determination that neither victim’s DNA was found in the specific areas of the sneakers which she sampled, that limited factual predicate seemed plainly overstretched to support the defendant’s argument that he was not one of the shooters. Having had the opportunity to assess the strength of the Commonwealth’s evidence at trial, including on the issue of identification, I concluded that the 2004 DNA test results lacked sufficient weight as exculpatory evidence to cast any real doubt on the justice of the defendant’s convictions. See, e.g., Commonwealth v. Dascalakis, 246 Mass. 12, 33 (1923) (“It often has happened that confessedly newly discovered evidence has been held in criminal cases to be not of sufficient weight to be worthy of consideration in view of the overwhelming force of evidence for the Commonwealth”); see also, e.g., Commonwealth v. DeChristoforo, 360 Mass. 531, 543 (1971) (weight and import of new trial motion affidavit, even where undisputed, falls within broad discretion of trial judge, who may make use of knowledge of what took place at trial in considering new evidence).
Pursuant to G.L.c. 278, §33E, the defendant then petitioned a single justice of the Supreme Judicial Court for leave to appeal the denial of his new trial motion. The petition was allowed, and the appeal was heard by the full court.
In January 2011, the Supreme Judicial Court issued a decision that vacated the denial of the defendant’s motion for a new trial. Commonwealth v. DiBenedetto, 458 Mass. 657, 672 (2011). While not disagreeing with my ruling that a new trial was not warranted based on the impact the new DNA evidence had on the Commonwealth’s phenolphthalein test result evidence, see id. at 667, the Supreme Judicial Court remanded the matter “for further findings concerning the proffered DNA evidence and its importance to the . . . claim that [the defendant] was not the third shooter in light of the evidence presented at trial,” id. at 670.[5]
In March 2012, the defendant and Commonwealth each submitted a memorandum regarding the issue to be addressed on remand,[6] and I thereafter heard oral arguments at a nonevidentiaiy hearing. The defendant later also filed a post-hearing memorandum in support of his motion for a new trial and a video recording of the prosecutor’s closing statements at his 1994 trial.
Now, upon careful consideration of the parties’ respective arguments and a thorough review of the defendant’s filings and the record of the trial, I make the following findings and conclusions concerning the matter remanded. In so doing, I can, and expressly here do, “make use of [my] knowledge of what occurred at trial.” Commonwealth v. Kirwan, 448 Mass. 304, 315 (2007), citing Commonwealth v. DeChristoforo, 360 Mass. at 543; see Commonwealth v. Santiago, 458 Mass. 405, 415 (2010), quoting from Commonwealth v. Grace, 397 Mass. at 305-06 (analysis requires thorough knowledge of trial proceedings and can be aided by judge’s observation of events at trial). See Commonwealth v. DiBenedetto, 458 Mass. at 670-71.[7]
DISCUSSION
1. Standard of Review
“The familiar principles governing a motion for a new trial based on newly discovered evidence are stated in Commonwealth v. Grace, 397 Mass. [at 305-06].” Commonwealth v. Caillot, 449 Mass. 712, 724 (2007); accord Commonwealth v. DiBenedetto, 458 Mass. at 664. Because, as noted supra, the issue has yet squarely to be raised whether the newly proffered DNA evidence is “ ‘newly discovered’ as that phrase is descriptive of a ground for a new trial,” Commonwealth v. Pires, 389 Mass. 657, 665 (1983), the only question addressed here is whether the defendant has met his burden of showing the “importance ... of that evidence,” Commonwealth v. Grace, 397 Mass. at 306. In this regard, to merit a new trial and overcome the Commonwealth’s recognized “interest in finality”; id.; see, e.g., Commonwealth v. Pingaro, 44 Mass.App.Ct. 41, 54-55 (1997) (community interest in finality, which insures integrity and predictability of judicial procedures); see generally Commonwealth v. LeFave, 430 Mass. at 181 (doctrine of finality); the defendant must establish that the new evidence “casts real doubt on the justice of the conviction.” Commonwealth v. Grace, 397 Mass. at 305; Commonwealth v. Rosario, 460 Mass. 181, 195 (2011).
That showing may be broken down into two interrelated parts. As an initial matter, “[t]he evidence said to be new not only must be material and credible but also must carry a measure of strength in support of the defendant’s position” (citation omitted). Commonwealth v. Grace, 397 Mass. at 305; Commonwealth v. Rosario, 460 Mass. at 195; see, e.g., Commonwealth v. Wolinksi, 431 Mass. 228, 237 (2000); see also Commonwealth v. *282 Brown, 378 Mass. 165, 171 (1979), quoting Davis v. Boston Elevated Ry., 235 Mass. 482, 495 (1920) (“[T]he evidence ‘must be weighty and of such nature as to its credibility, potency, and pertinency to fundamental issues in the case as to be worthy of careful consideration’ ”). Moreover, the evidence must be of sufficient consequence that, considering the strength of the case against the defendant, “there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial.” Commonwealth v. Grace, 397 Mass. at 306; Commonwealth v. Caillot, 449 Mass. at 724-26.
A defendant makes the requisite showing as to the importance of the allegedly newly discovered evidence when the motion judge is satisfied that the evidence “would probably have been a real factor in the jury’s deliberations.” Commonwealth v. Grace, 397 Mass. at 306; Commonwealth v. Murray, 461 Mass. 10, 21 (2011).
Applying those principles in my earlier decision, I determined the defendant had failed to make the necessary showing: the new DNA evidence had at most nominal exculpatory value that was overwhelmed by the strength of the Commonwealth’s case. I adhere to that determination for the reasons more fully developed below.
2. Strength of the Defendant’s New Evidence
As to the first part of the analysis, the defendant has not established that the new evidence necessarily has any exculpatory value. At this stage, “the burden is on the defendant to prove facts that are ‘neither agreed upon nor apparent on the face of the record.’ ” Commonwealth v. Comita, 441 Mass. 86, 93 (2004), quoting Commonwealth v. Bernier, 359 Mass. 13, 15 (1971). On the showing made here, for instance, it would be reasonable to infer that the sneakers analyzed in 2004 simply were not the shoes the defendant was wearing at the scene of the crimes. The credible and undisputed trial evidence demonstrated that the subject sneakers were seized from the defendant at the Boston police station approximately four days after the shootings. (E.g., tr. Jan. 26, 1994; at 140-42.) That extended period of time, it could readily be inferred from this record, provided the defendant more than ample time to discard or destroy possibly incriminating evidence, such as clothing worn at the crime scene. See, e.g., Commonwealth v. Roman, 427 Mass. 1006, 1007 (1998), quoting from United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982) (“Neither juries nor judges are required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in the light of their experience as to the natural inclinations of human beings”). The inference that the defendant in fact took that opportunity to dispose of his sneakers and other incriminating evidence obviously is consistent with the negative evidence offered by the defendant that the police search of his apartment several days after the shootings failed to turn up the sneakers and other clothing which the police were told had been worn during the homicides or the type of handgun and ammunition that reportedly had been used. (See Def.’s Mar. 6, 2012, Mem. at Ex. 3.) The inference also is easily harmonized with the testimony of eyewitness Joseph Schindler that the seized sneakers “look(ed) similar to the footwear” which the defendant was wearing at time of the crimes (tr. Jan. 19, 1994, at 124). Juries draw inferences based on common sense and everyday life experiences, e.g., Commonwealth v. Angelo Todesca Corp., 446 Mass. 128, 141-42 (2006), and it would be entirely reasonable for a jury to infer that the defendant, like any number of people, had more than one pair of similar-looking shoes (or at least what might be so described under the circumstances Schindler recounted at trial). The burden is upon the defendant to establish facts sufficient to prove that his newly proffered evidence carries the requisite “measure of strength in support of [his] position,” Commonwealth v. Grace, 397 Mass. at 306. See Commonwealth v. Comita, 441 Mass. at 93-94. If, as the defendant has failed to prove otherwise, the sneakers tested in 2004 were merely another pair of shoes he had, the non-match results of the 2004 DNA tests have no measurable exculpatory value.[8]
In all events, the exculpatory value of the new DNA evidence is problematic at best. According to the Second Analytical Report of the forensic serologist retained by the defendant, the subject sneakers were sampled for DNA analysis in only eight specific areas.[9] Nothing in the serologist’s report or her accompanying affidavit indicates that neither victim’s DNA is on the unsampled parts of the sneakers, which a plain reading of the report suggests is the majority of the surface area of the shoes. At most, therefore, the defendant has shown that neither victim’s DNA is on some portion of his sneakers, not the complete absence of the victims’ DNA from those shoes.[10] Accordingly, when used to support the defendant’s position that he was not the individual witnessed shooting one or both the victims from close range, the new DNA evidence is inconclusive and of questionable probative value.
3. Strength of the Case Against the Defendant
As to the second part of the analysis, insomuch as the DNA evidence is “of sufficient weight to be worthy of consideration” as exculpatoiy evidence, Commonwealth v. Dascalakis, 246 Mass. at 33, that new evidence is overwhelmed by the strength of the case which the Commonwealth presented against the defendant (exclusive of the phenolphthalein testing evidence). As recognized on direct appeal, “This is not a case in which there was a single eyewitness and little or no evidence to corroborate the identification.” Commonwealth v. DiBenedetto, 427 Mass. at 420. Among other evidence, the Commonwealth’s case included the eyewitness testimonies of Schindler and Richard Storella, each of whom independently identified the defendant as one of the three shooters. In my judgment, Schindler’s testimony on the issue of his iden *283 tification of the defendant as one of the three shooters was entirely credible and reliable, corroborated by Storella’s separate and indisputably reliable identification of the defendant. That corroborative testimonial evidence was, in my opinion and likely also that of the juiy, very strong. The sum and substance of the Commonwealth’s key evidence left no reasonable doubt of the defendant’s guilt.
Schindler, as the Supreme Judicial Court recently observed, “was the linchpin of the Commonwealth’s case.” Commonwealth v. DiBenedetto, 458 Mass. at 668. What presumably is less apparent from the record is that Schindler came across at trial as a very impressive and thoroughly credible witness. Absolutely candid and unshakeable, his testimony remained potent and convincing on cross examination in the face of lengthy and vigorous challenges by able defense counsel.[11] Schindler credibly testified to the following relevant facts.
In February 1986, Schindler was living with his wife in an apartment on Copp’s Hill Terrace in Boston’s North End. They had been living there for about a year and a half, and Schindler was familiar with the building where he and his wife lived and with the surrounding areas, including Slye Park. The apartment was on the third floor and looked out over and into the Park.
On February 19, at around 9:30 P.M., Schindler was home with his wife when he heard a number of loud “cracks” or “pops” outside in the direction of Slye Park. He looked out a living room window and saw several white male individuals near the entrance to the Park at the intersection of Copp’s Hill Terrace and Charter Street. As he was looking out the window, he saw a repeated “red orange flash” near the outstretched hand of the smallest individual.
Realizing that something unusual was occurring, but not being able to observe it from that window, Schindler went to get a better look from another window. He had been a Middlesex County assistant district attorney and understood the importance of making careful and precise observations. As he walked through his apartment, the cracking/popping sounds continued. He went into his study, which was dark and provided an unimpaired view of the Park. That night, the Park was illuminated by both artificial lighting and moonlight.
Schindler initially saw four white male individuals running into the Park, one near some benches, another by a kiosk, and two in front of them. Eventually, Schindler saw a fifth white male individual, who also ran into the Park in the same direction as the others. One of the running individuals fell face first onto the ground near the benches, another fell to the ground near the kiosk and stopped moving.
Three individuals ultimately left the Park, the first was the shortest of the three, the third was the tallest, and the second was in between the heights of the first and third. The third individual was to the side of the person who fell near the benches, but closest to the individual who fell near the kiosk.
As that third individual cut diagonally across the Park toward Jackson Avenue, Schindler saw his left profile. The person was moving at a pace faster than a walk, but he was not running. At some point, that person stopped and turned around. As he did so and walked back toward the park benches, Schindler saw the individual’s front profile, head to toe, including his uncovered face. There were some tree branches in Schindler’s line of sight, but they did not obstruct his view to any significant degree. The person had a handgun which he put into his right hand.
After walking back to the area near the park benches, the individual bent down to within inches from the head of the person lying face down on the ground. Schindler then saw the individual fire the handgun between four and six times, seeing and hearing the same sort of flashes and sounds which he previously had. In court, Schindler identified that' shooter as the defendant.
The first of the three individuals to leave the Park after the shootings was positioned so that Schindler mostly saw his back. As that person turned left to go down the stairwell by Commercial Street, Schindler saw his left profile. The lighting was fair. The person, moving at a pace that was faster than a walk but slower than a run, then descended to a landing area where the lighting was better. At that point, his front profile, head to toe, was visible to Schindler. Eventually, as the person walked towards the area fronting Commercial Street, he stopped, looked back to his left, looked to his right, and looked up at Schindler. The lighting conditions in that area were excellent, and Schindler was able to see the person’s front profile and entire face. The individual then left, cutting across Commercial Street towards the harbor. In court, Schindler identified that person as the codefendant, Costa.
The codefendant was the shortest of the three individuals to leave the Park that night. He appeared to Schindler to be a thinly built, young teenager, with dark hair. He wore dark-colored slacks and a waist-length, apparently navy blue, coat or jacket that was unzipped or unbuttoned halfway down his chest. Schindler recalled at trial being struck by the fact that the codefendant was a handsome young man.
The second individual to leave the Park took the same route leaving as did the codefendant. In court, Schindler identified an arrest photograph of Paul Tanso as that second person.
The defendant left the Park by the same stairwell as had the codefendant and Tanso. It had taken the defendant as much as a minute from the time he had initially run toward Jackson Avenue, reversed course, gone back to the prone body and discharged his weapon, and then run back to the Jackson Avenue stairway. After the defendant left the Park, he also crossed Commercial Street and went in the direction of the harbor.
*284 As the defendant was leaving Slye Park, Schindler was able to observe his front profile, head to toe. The defendant was slow and careful going down the icy stairs, as the codefendant had been, but the defendant moved faster than the codefendant. The defendant also stopped in the well-lit area fifty feet from Schindler and looked around left and right. Although the defendant had earlier pulled his sweatshirt hood up over his head, at the time he stopped, his head was not concealed under the hood.
The defendant was taller than the codefendant and Tanso. His hair was dark in color, similar to the codefendant’s. He was wearing an unzipped, bluish-gray, hooded sweatshirt and lighter-colored slacks. Under the sweatshirt, he wore a T-shirt, which was lighter in color than his sweatshirt and pants. He was wearing sneakers, with a red Nike “swoosh” logo, that were once white but had grayed somewhat with age. The sneakers looked similar to those later admitted into evidence as the shoes the defendant was wearing at the time of his arrest.
The entire incident lasted about three to five minutes. Of that time, Schindler had been looking out the window of his study for about two to three minutes. He had a panoramic view of the Park from that window and was able to focus on any or all of the individuals during the incident. He focused primarily, however, on the defendant and codefendant. Of the many identifying factors that formed the bases of Schindler’s identifications, the most important to him was an individual’s face.
On February 28, Schindler participated in multiple videotaped lineups at the Boston police station.[12] The codefendant appeared in the first lineup as “number 3.” Schindler identified “number 3" as one of the shooters and, in court, stated that this identified person was the codefendant. The defendant appeared in a subsequent lineup as ’’number 4." Schindler identified “number 4" as one of the shooters and, in court, stated that this person was the defendant.
Schindler had not seen any photographs of the defendant or codefendant prior to viewing the lineups.[13] As far as Schindler knew, he had also not seen either the defendant or codefendant in the North End prior to the shootings. Only after participating in the lineup procedures did Schindler learn that Storella had also identified the defendant and codefendant as two of the three shooters.
On March 3, 1986, Schindler appeared in Boston Municipal Court to give testimony concerning the defendant and Tanso. There were around twenty-five to thirty-five people sittingin the courtroom, anumber of whom appeared to be about twenty years old. Schindler saw both the defendant and Tanso among the people sitting in the courtroom and identified them as two of the individuals he had seen on February 19. Schindler had no doubt in his mind as to his identifications.
Ten days later, on March 13, Schindler appeared in Boston Juvenile Court to give testimony concerning the codefendant. At that proceeding, Schindler identified the codefendant as one of the individuals he had seen on February 19. There was also no doubt in Schindler’s mind as to this identification. (Tr. Jan. 18-21, 1994.)
I had the opportunity at trial to observe Schindler firsthand. He seemed fair and impartial, honest, and forthright. The substance of his testimony, and his overall credibility, did not diminish on cross-examination, despite considerable efforts by defense counsel to impeach his credibility and show bias. I credited the substance of Schindler’s testimony at the time of trial and similarly credit it now upon review of the trial record.
Based on that credible testimony, I also conclude that the identifications Schindler made were reliable. Schindler observed the incident from a third-floor apartment that overlooked the Park. He had lived in that apartment for over a year and was familiar with both his building and also the surrounding area. From the window in his apartment study, he had a panoramic view of the shooting incident.[14] The Park was sufficiently illuminated that night to make reliable observations, and Schindler had an adequate opportunity to make such observations during the two to three minutes he watched from his study window. Schindler appreciated what he was witnessing and paid close attention to the events unfolding before him. He was able to give a detailed description of the defendant’s actions and appearance that night, as well as of the defendant’s height and hair color relative to the other individuals witnessed in the Park.
Schindler credibly testified that he based his identification of the defendant on all the information accumulated that night and, in particular, on the observation made of the defendant exiting the Park. Schindler credibly testified that he was approximately fifty feet from where the defendant stopped. The lighting in that area, according to Schindler’s credible testimony, was “excellent.” Schindler credibly testified that he could see the defendant’s uncovered head at that time.[15]
I found at the time of trial, and also now find, that this identification testimony given by Schindler was credible and that Schindler’s identification of the defendant was reliable. Notably, this determination accords with that made by the Supreme Judicial Court on direct appeal in the companion case involving Tanso. See Commonwealth v. Tanso, 411 Mass. 640, 653 (1992) (“[A] review of the record . . . supports the [suppression motion] judge’s findings that Schindler’s observations were reliable”).[16]
In sum, Schindler’s testimony alone could have proven, and I find likely did prove to the jury at trial, the defendant’s guilt beyond a reasonable doubt.
Moreover, Schindler’s identification of the defendant as one of the three shooters was independently corroborated by Storella. As I indicated in my previous decision, the primary value of Storella’s testimony to the Commonwealth’s case was corroborating *285 Schindler’s identifications. To that extent, Storella testified to an account of the February 19, 1986, shootings in Slye Park that included details which the jury reasonably could have found to confirm, and I find likely did so confirm, significant aspects of Schindler’s eyewitness testimony. (See tr. Jan. 24, 1994; at 128-50.) More importantly, within a few days of the shootings, Storella — who indisputably knew the defendant well enough to identify him reliably — told Boston police detectives that the defendant was one of the three shooters.[17] As reflected in the prosecutor’s closings, Schindler’s and Storella’s independent identifications, which were mutually corroborative, formed the core of the case against the defendant.
4. Effect of the New DNA Evidence
This core strength of the Commonwealth’s case plainly would be undiminished by the facially questionable exculpatory value of the defendant’s new DNA evidence. Considering the persuasiveness of the Commonwealth’s identification evidence, I find it most likely that a jury would attribute the non-match results of the 2004 DNA tests to the shortcomings of that evidence rather than any reason exculpative of the defendant.
Even were the new DNA evidence proven to have the evidentiary value the defendant ascribes to it, there is no substantial risk that the jury would have reached a different conclusion had that evidence been admitted at trial. The defendant contends that the absence of either victim’s DNA from the sneakers could permit the inference the defendant was not the person witnessed shooting at the victims from close range. But there is no real possibility a jury would draw that negative inference where: (1) one witness credibly testified that he had seen the defendant shooting the victims and further that he had observed those shootings under conditions that were adequate to make reliable identifications, (2) a second witness, who indisputably knew the defendant well enough to reliably identify him, testified that he (the witness) had also seen the defendant shooting the victims, and (3) within days of the shootings, both eyewitnesses independently identified the defendant to the police as one of the shooters. Juries determine the material facts of a case by considering all the evidence together rather than in the fragmentaiy manner the defendant repeatedly argues. There can be no reasonable doubt that Schindler’s identification of the defendant was reliable given Storella’s indisputably reliable identification, much as any doubt about Storella’s credibility in identifying the defendant effectively was removed by Schindler’s identification testimony. I find and conclude that the Commonwealth’s evidence sufficiently established the defendant’s identification and guilt to the jury such that the new DNA evidence would not “have been a real factor in the jury’s deliberations,” Commonwealth v. Grace, 397 Mass. at 306.
5. Conclusion
On a motion for a new trial based on newly discovered evidence, the defendant bears the burden of proving that the evidence alleged to be newly discovered “casts real doubt on the justice of the conviction.” Id. at 306. The defendant here, relying upon naught but gossamer inferences and speculation, has failed to meet that burden. As I previously determined, the new DNA evidence at most undermined the Commonwealth’s phenolphthalein testing evidence, a marginal aspect of the case that was likely insignificant to the jury’s assessment of the defendant’s guilt. The “extraordinary circumstances” that could warrant a new trial, Commonwealth v. Comita, 441 Mass. at 93, are not present in this case, and the defendant’s motion for postconviction relief pursuant to Mass.R.Crim.P. 30(b) accordingly is denied.
ORDER
It is therefore ORDERED that Frank DiBenedetto’s Motion for a New Trial, upon the further consideration ordered by the Supreme Judicial Court, Commonwealth v. DiBenedetto, 458 Mass. 657 (2011), is DENIED.

 A third person, Paul Tanso, was also arrested and indicted in connection with the 1986 homicides. Tanso was tried separately and acquitted. DiBenedetto v. Hall, 272 F.3d 1, 4 (1st Cir. 2001); see also Commonwealth v. DiBenedetto, 427 Mass. 414, 415 n.3 (1998).

 The affidavit indicated that the forensic serologist had “found very small amounts of human DNA on the sneakers which, when analyzed, yielded weak and incomplete genetic profiles that were mixtures from at least three people.” (Hanniman Aff. at par. 4.) The affidavit further indicated that, upon comparison with the DNA extracted from the victims’ blood samples (see id. at par. 3), the serologist nevertheless “was able to exclude Chiuchiolo and Bottari as contributors” to the DNA she extracted from the defendant’s sneakers (id. at par. 4).

 The Commonwealth made no argument that the DNA test results purportedly excluding the victims as contributors to the DNA found on the defendant’s sneakers were not newly discovered, although there may have been good reason to doubt that this evidence “was not reasonably discoverable at the time of trial.” Commonwealth v. Grace, 397 Mass. 303, 306 (1986). Certainly, DNA testing had been used in forensics well before the defendant’s trial in 1994, see, e.g., Thompson & Ford, DNA Typing: Acceptance and Weight of New Genetic Identification Tests, 75 Va.L.Rev. 45, 46 & n.4 (1989), citing authorities, as had polymerase chain reaction (PCR)-based DNA testing, see, e.g., Spencer v. Commonwealth, 240 Va. 78, 84 (1990). Reportedly, a combination of PCR-based DNA tests in use by January 1994 for analyzing DNA in mixed evidence samples “offered an extremely high exclusionary rate,” State v. Lotter, 266 Neb. 758, 776-78 (2003), and, indeed the forensic serologist retained by the defendant in this case implicitly allowed for the possibility that DNA analysis methods available in 1994 could have excluded the victims as contributors to the DNA she found (cf. Hanniman Aff. at par. 8). The essence of the serologist’s opinion otherwise was that the PCR-based testing method she used, which analyzed short tandem repeat (STR) marker loci, was more reliable for testing the samples she obtained than the PCR-based testing methods available in 1994. See id; see also State v. Lotter, 266 Neb. at 778 (expert affidavit stated that discriminating power of DNA test results had increased since 1995 with ongoing discovery and validation of additional loci); see generally Commonwealth v. Rosier, 425 Mass. 807, 810-11 (1997) (STR loci testing). However, evidence does not qualify as newly discovered simply because it is derived from an *286 evolution In the reliability of the underlying science. See Commonwealth v. LeFave, 430 Mass. 169, 181 (1999); Commonwealth v. Shuman, 445 Mass. 268, 275 (2005); cf. State v. hotter, 266 Neb. at 781-82 (statute required specific type of DNA testing defendant requested).

 This argument inferably was an afterthought, or else, for the reasons discussed infra, the defendant would have had the forensic serologist examine areas on the sneakers other than just those necessary to challenge the Commonwealth’s phenolphthalein test result evidence.

 The Supreme Judicial Court further concluded that an evidentiary hearing regarding the new DNA evidence would be appropriate if the Commonwealth so requested. Commonwealth v. DiBenedetto, 458 Mass. 657, 671 (2011). The Commonwealth had not previously challenged the conclusions which were drawn by the forensic serologist retained to perform the DNA analysis. At a hearing in March 2012, the Commonwealth represented that it was not requesting the evidentiary hearing contemplated by the Supreme Judicial Court.
The Supreme Judicial Court also permitted the Commonwealth on remand to raise the issue whether the new DNA evidence qualifies as newly discovered. Id, at 664 n.11, 671 n.20. Although that issue, as noted supra, had not directly been raised before me, the Commonwealth included an argument on appeal that the 2004 DNA test results were not newly discovered. Id, at 664 n. 11. The newness issue has not been raised on remand;

 With his memorandum, the defendant included an affidavit from Carl Ladd, a forensic scientist, who is the supervisor of the DNA Unit in the State of Connecticut’s Forensic Laboratory, and a report from Samuel R. Sommers, an associate professor of psychology at Tufts University. The Sommers report is used to support the “arguments regarding the fallibility of eyewitness testimony’’ which the Supreme Judicial Court permitted the defendant to raise on remand. Commonwealth v. DiBenedetto, 458 Mass. 657, 669 n. 17 (2011).

 Should there be any question about the matter, I note here that this case was particularly memorable. Among other things, it stood out because of the nature of the crimes: a double homicide — essentially a double execution — in the North End section of Boston. Chiuchiolo was shot seven times, including five shots to the head; Bottari was shot sixteen times, including six shots to the head. This was also an atypical murder case in that the trial featured an attorney, Joseph Schindler, as its main witness. And, through the trial, Schindler proved himself to be an extraordinary person who had shown remarkable commitment and civic responsibility over the long history of the case. The circumstances surrounding the case attracted a notable amount of public interest, and the trial was selected to be broadcast on television.

 Of course, this is only the most obvious inference permitted by the defendant’s showing for which the new DNA evidence would have no significant exculpatory value. Another straightforward inference, for example, is that the defendant, wary of being linked to a double homicide by something so apparent as blood on his sneakers, took sufficient precaution and care to avoid any blood splatter. See, e.g., Commonwealth v. Roman, 427 Mass. 1006, 1007 (1998), quoting from United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982) (juries apply reasonable inferences as justified in light of their experience as to people’s natural inclinations). But the point is not to catalogue all the permissible inferences but to illustrate the critical weakness of the defendant’s evidence by showing that it permits inferences fatal to his argument. At the post-conviction stage, the defendant has the burden to establish all the facts necessary to the allowance of his motion. See, e.g., Commonwealth v. Comita, 441 Mass. 86, 93-94 (2004).

 The serologist sampled three areas where she had earlier obtained “positive results" when testing “for the presumptive presence of blood”; two areas that were marked with blue ink; and three control areas. The blue ink marked areas where there had been a positive result from the phenolphthalein testing conducted prior to the defendant’s 1994 trial.

 On remand, the defendant plainly overstates the conclusions in the forensic serologist’s report and affidavit by contending that “the DNA results show that there is no DNA — and therefore no blood — from either of the victims on DiBenedetto’s sneakers.”

 Defense counsel cross examined Schindler for the better part of two days, questioning his credibility, including with regard to potential bias in favor of the prosecution, and the reliability of his identifications. (See tr. Jan. 20-21, 1994.)

 Portions of the taped lineups were played in court at the defendant’s trial.

 Although Schindler testified at trial that he had read about the shooting in the Boston Globe and had learned from the article that three suspects had been arrested, he also credibly testified he had not seen the accompanying photograph of the defendant and Tanso. Schindler credibly testified that he had asked his law partner and secretary at the time to peruse the paper for stories about the incident and delete any accompanying photos. This issue was fully explored at trial, and I credit, as probably did the jury, Schindler’s testimony. Notably, the codefendant was not in the accompanying Globe photograph.

 The defendant’s trial included a view of Slye Park and of Schindler’s apartment (tr. Jan. 19, 1994; at 3-38). In part, during that visit, I and the jurors stood at the window in Schindler’s study. I formed a vivid impression of the breadth of the view from that window; it is likely the jurors also were impressed by the view of the Park from that perspective.

 To be clear, I find that the credible trial evidence was not, as the defendant persistently maintains, that “Schindler’s ability to identify DiBenedetto was based solely on [Schindler’s] having seen perpetrator #3 at night for 3-5 seconds from a distance of almost 90 feet.” Nor does the credible evidence establish the reiterated argument that Schindler’s identification of the sneakers was a “central aspect” of his identification of the defendant.

 Before making these determinations, careful consideration was given to the Sommers report offered by the defendant on the issue of the fallibility of eyewitness identifications generally and of Schindler’s identifications specifically. Of course, this is not the first time the defendant has challenged the reliability of Schindler’s identifications. See Commonwealth v. DiBenedetto, 427 Mass. 414, 420 (1998). I am well aware of the problem of wrongful convictions due to mistaken eyewitness identifications. This is not such a case.

 To be sure, the jury may well have given little or no weight to much of Storella’s testimony; after all, he admitted at trial to having lied numerous times about the Slye Park shootings, including under oath in prior proceedings. However, a jury are entitled to believe part of a witness’s testimony, even where they disbelieve other parts, see, e.g., Koonce v. Commonwealth, 412 Mass. 71, 75 (1992), quoting Commonwealth v. Fitzgerald, 376 Mass. 402, 411 (1978) (“Issues of the credibility and weight of the evidence are ‘for the jury to decide; they may accept or reject, in whole or in part, the testimony presented to them’ ”), and, here, I find the jury likely believed at least the portions of Storella’s testimony that accorded with Schindler’s identification of the defendant and of the codefendant. Indeed, once Storella admitted to police he knew about the Slye Park shootings, he never wavered from his position that the defendant and codefendant were two of the shooters. In contrast, Storella equivocated over time in his identification of Tanso, who, as noted supra, was acquitted at a separate trial.